Kling Bros. Engineering Works, Appellee and Cross Appellant, v. Whiting Corporation, Appellant and Cross Appellee, Carl W. Kling et al., Appellees.

Gen. No. 42,705.

Opinion filed December 13, 1943.   Rehearing denied December 28, 1943.

POPE & BALLARD and McNAB, HOLMES & LONG, all of Chicago, for appellant; BEVERLY B. VEDDER, CHARLES R. KAUFMAN and JOSEPH T. SCOTT, all of Chicago, of counsel.

VICTOR M. THEIS and ROBERT IRMIGER, both of Chicago, for appellees; ROBERT IRMIGER, JAMES J. CUSACK, JR., and JOHN F. CUSACK, all of Chicago, of counsel.

MR. PRESIDING JUSTICE O'CONNOR delivered the opinion of the court.

Plaintiff, Kling Bros. Engineering Works, filed its complaint in chancery against defendant, Whiting Corporation, praying that what it claimed to be an alleged contract entered into June 5, 1935, between plaintiff and the Quickwork Company, a corporation, and its successor defendant Whiting Corp. be decreed to be null and void, and that defendant be enjoined from interfering with plaintiff's manufacturing business by communicating with its customers, etc.   On motion of defendant Whiting, Carl, Olaf, Paul and Alfred Kling, Howard J. Aagaard and Benton W. Packer were made additional parties to the suit.   Summons was issued and they filed their appearance as "counterclaim defendants."   Defendant Whiting filed its answer denying the invalidity of the contract and its counterclaim, praying an accounting for the work which had been done under the contract, and for damages for the breach thereof by plaintiff.   The cause was referred to a master in chancery who took the evidence, made up his report and found the contract was not enforceable, lacked consideration and mutuality, and that it was in restraint of trade and illegal.

Objections were filed by Whiting; they were overruled and ordered to stand as exceptions. February 1, 1943, a decree was entered dismissing the complaint and the counterclaim for want of equity, and taxing one-half of the costs to each party. Defendant Whiting appeals from that part of the decree dismissing its counterclaim and taxing one-half of the master's fees against it. Plaintiff filed notice of a cross-appeal from that portion of the decree which dismissed its complaint and ordered it to pay one-half of the master's fees.

Counsel for the Whiting Corp., in their brief say: "The sole issue involved is the validity of an agreement between the Klings and the Quickwork Company, to which Whiting is successor in interest," and this seems to be the position of counsel for Kling Bros.

The record discloses that H. Collier Smith secured a patent on Quickwork rotary shears in 1910 or 1911, and was engaged in manufacturing the shears at St. Marys, Ohio, until his death in 1932. The shears were sold under the name of "Quickwork" all over the United States and many other countries. He was also engaged in manufacturing and selling power hammers. After Mr. Smith's death his widow and son and the cross-defendant, Benton W. Packer, managed the business which was afterward moved to Chicago, and in 1935, the Klings approached Quickwork with a view to securing orders for the manufacture of Quickwork shears and hammers. Klings operated a job shop in Chicago and were experienced manufacturers of heavy machinery, manufacturing for distributors such as Joseph T. Ryerson & Son, Scully Steel and Iron Co., and others.

On June 5, 1935, the contract in question was executed by the Klings and the Quickwork Company. The pertinent provisions of it are: "It is the intention of this agreement to create a working arrangement be-

tween the Kling Bros. Engineering Works and The Quickwork Company whereby the Kling Bros. Engineering Works will build certain machinery and parts for same on the order of The Quickwork Company and will in consideration of these orders protect the interests of The Quickwork Company in regard to the building or sale of similar equipment not authorized by The Quickwork Company.''

That as a means of protecting the Quickwork Company's interest Kling Bros. and its officers and stockholders who signed the agreement, bound themselves and their successors ''not to build, sell, have built or sold or in any manner take part in or assist in any enterprise the practical effect of which would be to the detriment of The Quickwork Company, its successors . . . by competing with this Company in the supplying of the machinery described below or parts hereof.'' Then follows a description of ''rotary shearing or flanging machinery . . . Mechanically operated power hammers similar to those now being supplied to the industry by The Quickwork Company.'' Then follows a recitation that while it is apparent that in all probability it will be for the best interest of the Quickwork Co. to have all of its machinery made by one builder, ''The Quickwork Company does not agree to have all of its machinery built by the Kling Bros. Engineering Works'' nor all of the parts of machinery, nor any specified part of its machinery built by the Kling Bros. for any specified length of time; that the agreement as to terms, prices and deliveries will have to be agreed upon by the parties as they arise; that all the patterns, drawings and jigs supplied by the Quickwork Co. for the use of the Kling Bros. Engineering Works, in the execution of the company's orders are to be stored by the Kling Bros. in a suitable manner if so requested by Quickwork. And that they shall be immediately available to Quickwork upon request and will remain the sole

property of Quickwork; that the work to be done by Kling Bros., unless specifically specified in an individual transaction shall be of the highest order—highest quality and first-class workmanship, etc., . . . .

"This agreement shall be considered as being in force as long as the Kling Bros. Engineering Works continue to build the above machinery or parts therefor on the order of The Quickwork Company, its successors . . . and for an additional period of ten (10) years thereafter."

After the execution of the contract, Quickwork placed many substantial orders for the manufacture of machines with Kling Bros. and delivered to the Klings drawings, jigs and technical information. Such orders were given, and manufactured by the Klings for about 6 years under the agreement, Quickwork paying Kling Bros. as high as $60,000 in one year and more than $200,000 altogether, for the manufacturing the Klings did. Early in 1940, Quickwork sold out to Whiting and the arrangement continued until early in 1941, when Kling Bros. employed two former employees of the Quickwork company and of Whiting.

On April 1, 1941, Kling Bros. wrote the following letter addressed to "The Quickwork Company, c/o Whiting Corporation, Harvey, Illinois. Gentlemen: Under date of June 5th, 1935, certain recitals were executed between your company and the undersigned. Inasmuch as your company has now ceased doing business, we are herewith notifying you that no further construction work will be performed under the arrangement referred to, and that said arrangement is herewith cancelled." Counsel for Whiting, in reply wrote Kling Bros. on April 4, 1941, acknowledging receipt of the letter, regretting that the Klings found it necessary to stop doing construction work under the contract of June 5, 1935, and hoping that the Klings' decision might be reconsidered, and continuing: "If

no further work is to be done by you, we assume that the ten-year period provided by the June 5, 1935, contract will begin to run when all of the work which you now have in process is completed and delivered. . . .

"It is not our understanding that the arrangement of June 5, 1935, is or can be canceled by you." To this letter plaintiff replied April 14, 1941, stating that all work then in process would be completed by the Klings for Whiting, and the letter continues: "Inasmuch as the item Kling Bros. Engineering Works is manufacturing for your client is one that has no patent rights attaching thereto, and is therefore manufacturable by anyone, Kling Bros. Engineering Works is of the opinion the ten year period prescribed in the previous arrangement is of no effect."

Afterward Kling Bros. manufactured a number of shears and hammers on their own account but none for Whiting, and a great deal of evidence was taken before the master as to whether such shears and hammers were similar or different from the ones theretofore manufactured by Kling Bros. for Whiting. We think the record discloses that the shears and hammers manufactured by Kling Bros. after they ceased doing business for Whiting, were substantially similar to the ones manufactured by them prior to that time.

Counsel for Whiting, in their brief argue and cite a number of authorities which they claim sustain their contention that the contract of June 5, 1935, is valid and enforceable, while counsel for the Klings contend to the contrary, with many citations of authorities.

We think the contract was unenforceable. It did not bind the Quickwork company or its successor, Whiting, to give any orders to plaintiff at all. And it did not bind the Klings to do any work unless they saw fit to do so. Either party could refuse to carry out any of the terms of the contract or could stop at any time he saw fit.

There is considerable said in the briefs as to whether the contract is a bilateral or unilateral con-

tract or no contract at all. Professor Williston, in his treatise on Contracts, Vol. 1, § 13, Revised Edition, says: "The term 'unilateral contract' is not infrequently used with a slightly different meaning from that here given; namely, to designate a promise for which no consideration was requested, or for which no sufficient consideration was given. It will be noticed that in this use of the word 'unilateral' as well as in the one suggested earlier in this section, the word indicates a promise made by one party to a bargain. If no sufficient consideration was requested for that promise or, if, though requested, the consideration was not given, the transaction is undoubtedly unilateral, but it is not a unilateral *contract*. A contract may give rise merely to an imperfectly enforceable or voidable obligation but a contract which creates no obligation is a contradiction in terms. Therefore, the term 'unilateral contract' should be reserved for cases where a legal obligation has been created, but only one party to the obligation has made a promise. Where there is no obligation, the transaction may be a unilateral promise or a unilateral offer, but it certainly cannot properly be called a unilateral contract."

And the same author, in section 60, in discussing the "Revocation of offers for unilateral contracts" says:

"It seems difficult on theory successfully to question the power of one who offers to enter into a unilateral contract to withdraw his offer at any time until performance has been completed by the offeree, but great injustice may arise if the offeror's power of revocation continues so long. . . .

"After the offeree has begun to perform under such an offer he may unquestionably stop performance halfway if he concludes that after all he does not care to enter into the contract, and if the offeror also may not revoke at that time he seems bound by a promise for which he has not received, and may never receive, the consideration requested, since the whole transac-

tion is still optional with the offeree." We quoted from this section in an earlier edition of Williston on Contracts in *Alexander Hamilton Inst. v. Jones,* 234 Ill. App. 444, where plaintiff was seeking to recover $110 under an alleged contract signed by defendant Jones. We affirmed the judgment in favor of defendant, holding the contract was invalid. In that case the defendant signed an "enrollment" for a course of service, agreeing to pay therefor $10 monthly until $120 was paid. He paid $10 and no more, and plaintiff brought suit to recover $110. Shortly after the contract was signed, 24 bound volumes, mentioned in the contract, were shipped by plaintiff to defendant, and shortly thereafter, defendant wrote plaintiff saying that because he had lost his business position it would be impossible for him to continue payment, and asked for advice concerning the disposition of the books. We there said: "On the face of the paper it is merely an offer by defendant and not enforceable until accepted by plaintiff so as to bind it to perform. It is what is sometimes called a unilateral contract void for want of mutuality. *Vogel v. Pekoc,* 157 Ill. 339. This seems to be conceded by plaintiff, but it is urged that part performance by the offeree, the plaintiff here, makes it a binding contract upon both parties. This is a broad statement of the rule. In writings of this sort the offeree may be bound in either of three ways: (1) by the offeree engaging, within a reasonable time, to perform the contract; (2) 'by beginning such performance in a way which would bind him to complete it; and (3) by actual performance.' *Plumb v. Campbell,* 129 Ill. 101.

"The question then is, did plaintiff, by shipping the books to defendant, which was the first of a series of things to be performed by it, begin such performance in a way which would bind it to complete the contract?

"The question involved is not free from difficulty. It has been the subject of discussion by text-writers and there is no uniformity of opinion in the decided

cases. The right of the offerer to revoke his offer, even after part performance by the offeree, has the support of a considerable number of cases." We then cite cases from Georgia, Massachusetts, Mississippi, Minnesota, New York, and Williston on Contracts, from which we have above quoted. And continuing we there said: "We are of the opinion that this writing was an offer by defendant to make periodical payments in consideration of a series of acts to be done by the plaintiff from time to time, and that an offer of this divisible character may be revoked not only before any acceptance but also as to any portion of the offer still unaccepted." See also *The Central Guarantee Co. v. Fourth and Central Trust Co.*, 244 Ill. App. 61.

We are further of opinion that the contentions of plaintiff that the contract is invalid because it is in restraint of trade, must be sustained. The contract provides that Kling Bros. shall not build, sell or in any manner take part in any enterprise that will compete with the Quickwork company or its successor in an area which is unlimited. *Parish v. Schwartz*, 252 Ill. App. 591, affirmed, 344 Ill. 563. In that case we held it was against the public policy of Illinois that a citizen should not have the privilege of conducting its business at some place within its border.

The decree of the superior court of Cook county is affirmed.

*Decree affirmed.*

NIEMEYER and MATCHETT, JJ., concur.