Manuel Goodman, Individually; Manuel Goodman &
Company, Inc., and Deepfreeze International Cor-
poration, Plaintiffs-Appellants, v. Motor Products
Corporation, a New York Corporation, Defendant-
Appellee.

**Gen. No. 10,832.**

Second District.

February 6, 1956.

Rehearing denied March 8, 1956.

Released for publication March 12, 1956.

Baker, McKenzie, Hightower & Brainerd, of Chicago, for plaintiffs-appellants; John C. McKenzie, and Lois J. Ely, both of Chicago, of counsel.

Johnston, Thompson, Raymond & Mayer, of Chicago, for defendant-appellee; Floyd E. Thompson, of Chicago, of counsel.

JUSTICE EOVALDI delivered the opinion of the court.

Manuel Goodman, individually; Manuel Goodman & Company, Inc., and Deepfreeze International Corporation filed a Complaint in the Circuit Court of Lake County against Motor Products Corporation, a New York corporation, L. J. Sorensen and B. G. Sanderson, charging that in October, 1940, the plaintiff, Manuel Goodman, entered into a contract with the defendant corporation, acting through Willard L. Morrison, its agent, giving the said Manuel Goodman an exclusive sales and distribution contract to sell food freezers manufactured by the defendant corporation under the trade name of "Deepfreeze" in the territory "outside the continental United States." The terms of the agreement, according to the plaintiffs' complaint, required Goodman to give up his other business ventures, competitive or otherwise, and devote his full time and attention to the sale and distribution of Deepfreeze appliances in territories outside the continental United States, to finance his own promotional activities and to render assistance in the formulation of domestic policy without further compensation other than the fruits of the contract. In return therefor, Goodman was granted the exclusive foreign distributorship and the right to set up corporations containing the word "Deepfreeze" in their name so long as they did not handle a competing product. The distributorship was to continue so long as Goodman devoted his full time and attention to the sale and distribution of Deepfreeze appliances, did not handle a competing line, gave adequate representation and so long as Motor Products Corporation was in the appliance business. The complaint further alleged that the plaintiff, Manuel Good-

man, did organize and was the sole owner of the plaintiff corporation, Manuel Goodman & Company, Inc., which was organized for the purpose of buying appliances from the defendant corporation, and of the plaintiff corporation, Deepfreeze International Corporation, which was organized for the purpose of acting as a foreign sales agent for the food freezers manufactured by the defendant corporation; and that the defendant corporation and its sales manager, L. J. Sorensen, and the general manager of Deepfreeze Division of Motor Products Corporation, Ben G. Sanderson, invaded the plaintiff's territory through direct sales to a distributor appointed by it in Mexico and thereafter sent the plaintiff a notice purporting to terminate the agreement as of November 28, 1953, in derogation of its contract and to the damage of all three plaintiffs. The original complaint was in four counts: Counts I, II and III being claims for damages, and Count IV being in equity by Manuel Goodman, individually, and by the Deepfreeze International Corporation, praying that the defendant Motor Products Corporation be restrained and enjoined from using the names "Deepfreeze International Corporation," "Deepfreeze International" and/or "Deepfreeze" in connection with the advertising, distribution or sale of products manufactured and/or sold by the Deepfreeze Division of the defendant Motor Products Corporation, in any country of the world other than the United States of America; and from using any advertising material or conducting any activity whatsoever which tended to deceive the public and to trade upon and damage the reputation and good will of the plaintiff, Deepfreeze International Corporation. The defendants filed their answers, which included several Special Defenses to Counts I, II, and III and a counterclaim to Count IV, the prayer of which asked the court to enjoin and restrain the plaintiff Manuel Goodman from using the word "Deepfreeze" in the corporate name

61

of any corporation controlled by him, or employing the term in any business activity, and directing him to dissolve the Deepfreeze International Corporation. The only claim submitted to the jury was the one contained in Count I of the complaint, and when the case was submitted the only plaintiff was Manuel Goodman, individually, and the only defendant was Motor Products Corporation. The demands for judgment by Manuel Goodman & Company, Inc., and by Deepfreeze International Corporation were dismissed and the dedismissed from the case. The jury returned a verdict fendants L. J. Sorensen and Ben G. Sanderson were awarding damages in the sum of $130,000 to Manuel Goodman, individually. Count IV, which purported to state a claim for accounting and injunction in equity, was submitted to the court on the record made on the trial of the issues of Count I. Thereafter the court sustained the defendant's motion for judgment notwithstanding the verdict, or, in the alternative, granted a new trial. Judgment was thereupon rendered in favor of the defendant. A decree was also entered dismissing Count IV of the complaint, and enjoining the plaintiff and others from continuing the use of the word "Deepfreeze" in their corporate name, or employing the term in any business activity, and directing Manuel Goodman to dissolve the Deepfreeze International Corporation. The plaintiffs have appealed from the decree and judgment of the Trial Court.

The ultimate facts requiring consideration are substantially as follows: Plaintiff, Manuel Goodman, is an exporter who for most of his life has been engaged in the business of foreign trade. The defendant Motor Products Corporation is a New York corporation licensed to do business in Illinois. It carries on divers lines of manufacturing through numerous divisions and in particular operates a branch in North Chicago, Illinois, known as Deepfreeze Appliances Division devoted to the manufacture and sale of Deepfreeze ap-

pliances. In 1940, defendant Motor Products Corporation entered the freezer and refrigerator market and Willard L. Morrison, who had invented the low temperature machine known as the Deepfreeze and had developed the same in the plant located in North Chicago, Illinois, which is now the Deepfreeze Appliances Division of the defendant corporation, was placed in charge of this department of the corporation. There is considerable dispute as to Morrison's relationship with the defendant, the defendant referring to him as a development and experimental engineer, and the plaintiff referring to him as the general manager of the Deepfreeze Appliances Division of the defendant Motor Products Corporation. From the evidence it is clear that Morrison was in charge of the manufacturing activities of the plant and that he appointed distributors of the products being manufactured, both orally and in writing. The plaintiff, Goodman, introduced himself to Morrison after reading an article which depicted Morrison as the inventor of a new successful food freezer and the head of the organization manufacturing them. In October of 1940 Goodman called on Morrison to inquire about selling the machines in the foreign market. Morrison at first told Goodman that the company was not interested in spending any money or in undertaking advertising to promote Deepfreezes outside of the country. Goodman insisted that if he were given exclusive export rights he would finance his own enterprise, service his own goods, handle all his promotional activities and would at the same time pay the manufacturer the same price for the machines that domestic distributors were paying. After several days of discussion an agreement was reached which, when interpreted in a light most favorable to plaintiff, was substantially as follows: Goodman was to have the exclusive rights to sell Deepfreeze products in all countries in the world outside of the continental United States so long as he devoted his

full time and attention thereto and gave adequate representation. Goodman was to refrain from the distribution and sale of any competing products so long as the agreement was in effect. Goodman was to devote his time and best efforts exclusively to the distribution and sale of Deepfreeze products in countries of the world outside the continental United States to the exclusion of any other business interest which he might theretofore have had. In the event Goodman failed to devote his time and best efforts exclusively to the distribution and sale of products manufactured and/or sold by the Deepfreeze Division of Motor Products Corporation the agreement would terminate and Goodman would get out of the appliance business. Goodman was to have the right of the use of the word "Deepfreeze" in his corporate name for so long as he did not sell a competing product. In the event Motor Products Corporation discontinued the manufacture and sale of products through its Deepfreeze Division, although continuing manufacture of other products, the agreement would thereupon terminate.

Goodman commenced selling and distributing appliances immediately after he and Morrison had settled the terms governing the conduct of the parties, and was given a desk in the North Chicago factory. He continued to distribute the products of the defendant corporation when they were available from 1940 to 1953. Goodman's allocation of the appliances during the war years, 1940 to 1945, was minute, and his orders far exceeded his supply. During the years 1945 to 1950 Goodman continued to distribute the appliances and was the only distributor of the company's products in the foreign market. About the middle of November 1951, Ben G. Sanderson, sales manager of the defendant corporation, phoned Goodman to say that he wanted to withdraw Canada from the plaintiff's territory. Goodman finally consented to this withdrawal

64

of Canada from his territory on the basis of being promised by Sanderson he would be given the right to distribute air conditioners, which were to be manufactured by Motor Products Corporation in tropical and subtropical regions.

It appears from the testimony on the part of the plaintiff, that in September or October of 1952, a domestic distributor of the defendant corporation, known as Radio City Distributing Company, of Dallas, Texas, sold a one-half car load of Deepfreeze freezers and refrigerators to José R. Santos, an appliance dealer in Monterrey, Mexico. At the direction of said Radio City Distributing Company, the defendant corporation, Motor Products Corporation, caused the shipment of these appliances to Laredo, Texas, for transportation across the border. In the early part of 1953, one Joe Davis, district manager of the defendant company in Texas, made arrangements with the same José R. Santos, the former customer of Radio City Distributing Company, to act as distributor for the defendant company in Mexico.

The defendant corporation by registered mail on July 29, 1953, notified the plaintiff, in writing, that his distributorship was terminated as of November 28, 1953, and refused subsequent to that time to sell the plaintiff any of its products.

It is plaintiff Manuel Goodman's theory that in October 1940, he entered into a contract with Willard L. Morrison acting as General Agent for defendant; that by the terms of the agreement, Goodman was required to give up all other business ventures, competitive or otherwise, and devote his full time and attention to the sale and distribution of Deepfreeze appliances in the territory outside the continental United States, to finance his own promotional activity, and to render assistance in the formulation of domestic policy without further compensation other than the fruits of said

contract; in return therefor, he was granted the exclusive foreign distributorship and the right to set up corporations containing the word "Deepfreeze" in their name, so long as they did not handle a competing product; the distributorship was to continue so long as Goodman devoted his full time and attention to the sale and distribution of Deepfreeze appliances, did not handle a competing line, gave adequate representation, and so long as defendant was in the appliance business; a further qualification was added, that in the event Goodman did not live up to his portion of the bargain and the contract was terminated through his fault, he would get out of the appliance business and not compete with defendant's Deepfreeze Division; that Goodman at all times carried out his part of the agreement; that after fourteen years of performance, the defendant invaded the plaintiff's territory through direct sales to a distributor appointed by it in Mexico and thereafter sent the plaintiff a notice purporting to terminate the agreement as of November 28, 1953, in derogation of its contract.

Defendant denies specifically that Goodman was granted any special rights to the use of the trade name and trade-mark "Deepfreeze" and that Goodman's agreement was to remain in force unless and until Goodman ceased to personally devote his time and efforts to effect the sale and distribution of Deepfreeze products. It contends that the Goodman distributorship was terminated as of November 28, 1953, by due and proper notice of termination, and it denies that Goodman has any claim for damages.

Under its second defense, it avers that the authority of said Willard L. Morrison, manager of its Deepfreeze plant, to make distributor's sales agreements was limited to making the usual and ordinary agreements in writing on the authorized and approved form, that he had no authority to make such an unusual and

66

extraordinary agreement of the terms and conditions alleged by plaintiff, in so far as they differ from those in the standard form, and that if an agreement of the terms and conditions alleged was attempted to be made with Goodman in 1940, it was of no force and effect as the agreement of defendant, except in so far as it is of the same terms and conditions as those stated in the approved and authorized printed form.

Under its third defense, it avers that an agreement of the terms and conditions alleged by plaintiff was never brought to the attention of the officers of defendant, or any of them, or its Board of Directors, and that neither an officer nor the Board had any knowledge of the existence of an agreement of the alleged unusual and extraordinary terms and conditions, and that it never ratified or acquiesced in an agreement with such unusual terms and conditions.

Under its fourth defense, it avers that the alleged agreement lacks mutuality in that it may be terminated by its alleged terms only by Goodman and that it may be terminated by him at will, and that the relief sought is in effect a specific performance of the alleged agreement and that a contract will not be specifically enforced unless it is mutual and can be enforced by either party against the other.

As to the equitable issues, defendant denies specifically that there was any agreement granting to Goodman any rights to the use of the word "Deepfreeze," which is defendant's registered trade-mark, except the right to use the word during and in the course of his marketing of Deepfreeze products, and that all rights to use said trade name and trade-mark terminated upon the termination of the distributor's sales agreement between it and Goodman. Its position is more specifically stated in its counterclaim in which it asks that Goodman Deepfreeze International Corporation be enjoined from using the word "Deepfreeze" singly

67

or in combination with any other word or words, as a part of a trade or corporate name or in connection with the advertising, distribution, or sale of products, on the grounds that a further continued use of defendant's trade-mark would be an invasion of defendant's property rights and a fraud upon the public.

Assuming that the oral agreement which Goodman alleged, and to which he testified, was made, it is one which was to run without a prescribed limit and which could be terminated only by Goodman in his uncontrolled discretion and was binding on defendant until Goodman of his own volition ceased to devote his time and efforts to selling and distributing Deepfreeze products. There is no evidence that Goodman agreed to devote his time and efforts to the selling for any period of time. It is admitted that Goodman had due notice of the termination. Under the doctrine of mutuality, such a contract in so far as it was executory, could be terminated by defendant by due notice at any time as to all or any part of Goodman's assigned territory. Joliet Bottling Co. v. Joliet Citizens' Brewing Co., 254 Ill. 215, involved an agreement under which the brewing company agreed to furnish beer for bottling and the bottling company agreed to bottle and market the beer as the brewing company's product so long as it furnished beer satisfactory in quality and in such quantities as the trade demanded. The brewing company terminated the contract and the bottling company brought suit for damages, alleging that it had expended a large sum of money in setting up its bottling works and in developing a market for the beer. Demurrer to the complaint was sustained and the bottling company appealed. Affirming the judgment, the Supreme Court said (pp. 218–9):

"The question presented for decision is whether the contract between appellant and appellee was valid and binding and capable of being enforced. Appellee's

68

contention is that it is void for want of mutuality; that the period of its duration is not fixed but is indefinite, and it was therefore terminable at the will of either of the parties. An examination of the contract satisfies us that these positions are well taken. By the contract appellee agreed to deliver beer to appellant in sufficient quantities to supply appellant's demand, and not to bottle or cause to be bottled, or to furnish to any other person, firm or corporation, beer for bottling so long as appellant was bottling appellee's beer. . . . The only thing the contract bound appellant to do was to pay the price agreed upon and bottle the beer of appellee and to market the same as the product of appellee so long as it furnished beer satisfactory in quality and in such quantities as the trade demanded. No mention is made of any period of time the agreement should continue in force. No maximum or minimum quantity is stipulated in the agreement, but the quantity to be delivered is such as shall be sufficient to supply appellant's demand. Under this provision appellant might demand a quantity so small as to make it impracticable for appellee to manufacture it, or it might demand such large quantities as to be wholly beyond the capacity of appellee. The quality of the beer was to be satisfactory to appellant. Under this provision of the agreement appellant had the option of refusing to accept beer from appellee, at its pleasure, upon the ground that it was not satisfactory. (Citations) It cannot be doubted, we think, that the contract was unilateral and void for want of mutuality under repeated decisions of this and other courts. (Citations) Furthermore, no time being fixed during which the agreement should continue in force, it was terminable at the will of either party. (Citations)"

To the same effect is Gage v. Village of Wilmette, 315 Ill. 328, wherein our Supreme Court held that where no definite time is fixed during which an executory

contract shall continue it is terminable at the will of either party.

A decision of this court applying the doctrine of mutuality in holding a contract terminable at will and unenforceable in so far as it was executory is First Mission Covenant Church of Rockford, Ill. v. Rockford Broadcasters, Inc., 324 Ill. App. 8. In that case, there was no question about the terms of the agreement between the parties. The question was the legal effect of the agreement which fixed no definite time during which the contract was to continue in force. This court concluded its opinion, saying (p. 15): "There can be no doubt that the contract was executory as to everything agreed to be done thereunder. The law is well settled that where no definite time is fixed during which an executory contract shall continue in force, it is terminable at the will of either party."

An early case, often cited with respect to the doctrine of unenforceability of contracts for want of mutuality, and which is strikingly in point, involved a contract whereby a cigar manufacturer offered to sell to a cigar dealer as many of a particular brand as he might desire and to continue to do so during the life of the brand or as long as the dealer cared to sell them. Holding that the Trial Court should have directed a verdict for the defendant in an action by the dealer against the manufacturer, the court said in A. Santaella & Co. v. Otto F. Lange Co. (C.C.A. 8), 155 Fed. 719, at pp. 721–3:

"The controlling question for determination is: Did the defendants have an enforceable contract with the plaintiff? It must be conceded that, if the defendants had such a contract, it was essential to its validity that it should have been mutually obligatory upon both parties. If the defendants could compel the plaintiff to ship cigars, the plaintiff ought to be in a position to compel the defendants to take. Were the defendants

70

under any obligation to send in orders within any particular time, or for any specified quantity or quality of cigars? The allegations of the counterclaim and the version given of the agreement in the testimony of Otto F. Lange answer these questions. It was entirely at the option of the defendants, dependent upon the conditions of their business and trade, as to whether they would send in any orders at all. From any cause, such as depression in business, or other more desirable arrangements, or a desire to get out of that line of trade, the defendants were at liberty to cease at any time to send orders to the plaintiff, without liability for breach of contract. . . .

"The contract described by the defendants is not enforceable against the plaintiff, as it is wanting in the essential of mutuality. The request by plaintiff for an instructed verdict should have been given."

Goodman could discontinue the distributorship any day he chose to cease to devote his full time and attention to the business without subjecting himself to any liability to defendant. Among other cases holding that such a contract is one terminable at will and is unenforceable in so far as it is executory, are Vogel v. Pekoc, 157 Ill. 339, 342-3; and Kling Bros. Engineering Works v. Whiting Corp., 320 Ill. App. 630, 635.

Plaintiff testified that the contract was to continue in full force and effect so long as he devoted his time and "attention" to distribution of Deepfreeze products in the export market. Even if we take the allegation of his complaint that the agreement was to remain in effect until he ceased to personally devote his time and best efforts to effect the sale and distribution of Deepfreeze products, there is no standard for determining when he has performed. What does "devote his time" mean? What does give his "best efforts" mean? Who is to determine these questions, plaintiff or defendant or a court or a jury? These terms are too vague to be

fairly intelligible. The phrases have no such distinct sense as to furnish a common and intelligent criterion for the party or any third party who must determine the sense in which they were employed. It is impossible to say that the minds of the parties met on the meaning of these phrases and that each party meant exactly what the other did, or even to say what either party meant. Goodman and his witness, Morrison, do not agree on what was said in their October 1940 conversations. These men failed to express themselves in terms capable of being reduced to certainty by judicial interpretation.

Davie v. Lumberman's Mining Co., 93 Mich. 491, at pp. 495–496, 53 N. W. 625, 626, is a case very closely in point. There plaintiffs made a verbal agreement with defendant to work its mine and to receive $1.50 a ton for all the ore they produced "as long as they could make it pay." Defendant terminated the contract and plaintiff sued for damages. The court, holding that the contract was not enforceable as an executory contract because of its uncertainty and want of mutuality, said:

"We do not think the contract is of such a character as to be enforceable as an executory contract. The agreement was simply that the plaintiffs would work at mining the ore in 'Cave Pit' for $1.50 per ton as long as they could make it pay. No limitations were put upon their methods, or how or in what manner they should conduct the work in order to make it pay, nor does it give the defendant any voice in deciding upon whether or not the plaintiffs could make it pay, nor does it place the subject of the contract upon any certain basis upon which a jury can lawfully and justly arrive at a fair rule of damages in case of its violation. Under this contract, the plaintiffs must be presumed to be the sole judges of whether or not it would pay them to do the work, and of how long they should con-

tinue it. . . . When a party agrees to sell articles of merchandise, or deliver the productions of his labor, to another at a certain price as long as he can make it pay, every one must clearly understand that the term is dependent on conditions over which the promisee has no control, and, in so far as any one has the power to make the term effective, it is lodged solely in the promisor, who by judicious purchases or skillful manipulations of labor may be able to make a transaction pay when a more careless, negligent, or improvident person would be unable to do so. This serious element of uncertainty destroys all mutuality in the contract, and gives the promisor full power to say when a further execution of the contract will not be advantageous, because he cannot make it pay. Contracts cannot arise where there is no mutuality, nor can they arise from the action of one party alone where the other has no power to prevent his action."

Davis v. Fidelity Fire Ins. Co., 208 Ill. 375, is authority for the proposition that a contract which is indefinite in its provisions cannot be enforced. There the court denied the claim of the agents for damages by reason of the closing of their insurance agency by the company. The court reviews the authorities on the subject and states its holding as follows (pp. 384–6):

"We have no doubt the parties fully expected that the western agency of the insurance company and the business relation established between them would continue for some time—perhaps for a period of years. Still, the time the western agency and the business relation between the parties were to continue was left indefinite by the agreement, and the insurance company was not bound to continue its western agency, and neither party, by the terms of the agreement, could require the other to continue the relation thereby established between them longer than such relation was agreeable to both."

73

Orr v. Ward, 73 Ill. 318, involved an employment contract which was indefinite with respect to the period of employment. The contract provided that plaintiff was to devote his whole time and attention solely to the interests of the employer and that he would be paid $2100 for the year 1873 and $2400 for the year 1874. Before the end of the first year plaintiff was discharged and he sued for damages. In reversing judgment for the plaintiff, the court said (p. 319):

"A complete answer to the breach assigned is, the contract contains no undertaking on the part of Cleveland, Johnson & Company to retain or continue appellee in the service of the firm for any definite period. . . . Their undertaking is to pay him at a certain rate of compensation, if he shall discharge the duties assumed by him to be performed. No doubt it is true each party contracted on the supposition the business would continue through the space of two years, but appellant's firm did not obligate themselves to continue it for that length of time."

Kling Bros. Engineering Works v. Whiting Corp., supra, involved a contract concerning the manufacture and sale of shears and hammers. The court found that the contract did not bind the manufacturer to sell any specific quantity of its products during any agreed period, and that it did not require the purchaser to take any quantity at any time and held, as a matter of law, that the contract was unenforceable, saying (p. 635):

"We think the contract was unenforceable. It did not bind the Quickwork company or its successor, Whiting, to give any orders to plaintiff at all. And it did not bind the Klings to do any work unless they saw fit to do so. Either party could refuse to carry out any of the terms of the contract or could stop at any time he saw fit."

Terre Haute Brewing Co. v. Dugan (C.C.A. 8), 102 F.2d 425, is a case very close on the facts to the

74

instant case. It involved a contract granting an exclusive agency for the sale of a particular brand of beer in a prescribed territory so long as the agent wished to put his personal time and financial backing into it and remain in the beer business. In holding the contract unenforceable, the court said (p. 426):

"From the foregoing it is apparent that, so far as the defendant is concerned, no obligation rests upon him to continue this agency any longer than he may wish to put his personal time and financial backing into it, and, incidentally, to remain in the beer business. The contract, therefore, is indefinite as to duration and lacks mutuality. If he can refuse, at will, to continue as a distributor for this particular brand of beer, the same right of self-determination must be accorded to the plaintiff."

Language more pertinent to the situation in this case could hardly be found. The plaintiff testified that his contract was to continue until he should cease to devote his time and attention to effect the distribution and sale of Deepfreeze products. He did not testify that he agreed to devote his time and attention to the business for any period. It is obvious that plaintiff could continue or terminate his distributorship at his pleasure and defendant could do nothing about it. There is no standard by which the court or a jury can determine when the plaintiff has performed. According to plaintiff's theory, he is the sole judge of whether he is discharging his duties under the agreement and he has complete control of whether the distributorship shall continue or terminate. Obviously, if plaintiff can refuse at will to continue as a distributor of Deepfreeze products, the same right of self-determination must be accorded to the defendant.

Plaintiff undertakes to take his contract out of the general rule that it is one terminable at the will of either party by arguing that he purchased the contract by giving up an established business. He had no

75

business in October 1940, and there is no evidence that he had any business connection after December 1934. He testified that in this 6-year period he travelled over this country and in Europe for three years and that following his return to this country he interested himself as a food broker for export. He does not say that he became a food broker at any time, that he ever handled a single transaction involving exporting food, or that he had any negotiations pending for exporting food. There is no evidence that he had an office or a staff or that he was otherwise prepared to carry on the business of food broker for export or any other business.

There is no evidence that Morrison was told by Goodman that he had a business or that he was discontinuing an existing business to accept a distributorship for Deepfreeze appliances, nor did Morrison ask Goodman to give up anything to take the distributorship. Defendant did not initiate the discussions with Goodman. It was Goodman who called at the Deepfreeze Division Offices for the express purpose of negotiating for an export distributorship. Whatever change in his business activities was made by Goodman upon taking the franchise was his own doing.

Defendant had no existing liability to Goodman nor was it otherwise under any obligation to him in October 1940. Goodman surrendered nothing to Motor Products when he made the agreement to become its export distributor. In fact, he did not even promise to continue the distributorship after he got it. He did not obligate himself to make the arrangement permanent. In so far as this record shows, Goodman walked in off the street looking for a job and he wound up with a job of "export manager" for Deepfreeze Division of Motor Products Corporation. There is no evidence that Goodman invested any money in the business. He was given a desk in the offices at the plant and paid no rent. Whenever inquiries from abroad

came to the company, they were turned over to him and he took the order for home freezers if he could get an order. He purchased the appliances to fill the order after the customer paid for them, and the goods were shipped in the name of Motor Products. This arrangement continued until September 1945. Thereafter, Goodman neither bought nor sold Deepfreeze appliances. Manuel Goodman and Company, Inc., an Illinois corporation, made all the purchases, and Deepfreeze International Corporation, an Illinois corporation, made all the sales. Goodman was a salaried employee of these corporations and all of his transactions with Deepfreeze Division after September 1945, were as manager of these two corporations. According to Goodman, he could do as little or as much as he liked and Motor Products could do nothing about it. The authorities are unanimous that the special consideration necessary for purchasing a permanent business relation is wanting in this case. Great reliance is placed by plaintiff on Molitor v. Chicago Title & Trust Co., 325 Ill. App. 124. It is characterized by plaintiff as a leading case, and as one almost identical as to facts, and identical as to defenses. That case is clearly distinguishable on the facts. In that case Mr. Molitor had formerly worked for the title company as a title examiner, the company sought his services and bargained with him to return; the company, by promising permanent employment to him in a position for which he was experienced and specially qualified, persuaded him to give up an established and growing law practice in New York; he not only gave up his private law practice, but his wife also gave up established and profitable music classes in New York; he sold his home in New York and moved his family to Chicago; the title company knew that the Molitors were making these sacrifices in consideration of its promise that Molitor was to have permanent employment as a title examiner. In contrast, Goodman had no former con-

77

nection with Motor Products, he sought the new connection, he was not asked to change his position to his detriment, and he gave up no established business in taking the distributorship of Deepfreeze products. The court below heard the evidence under Count IV of the complaint and under the counterclaim of defendant and determined that the equities were with the defendant and against the plaintiff and entered its decree accordingly. This decree will not be disturbed on issues of fact unless it appears that it is contrary to the manifest weight of the evidence.

The testimony of Goodman and Morrison shows that Goodman was given the right to use the word "Deepfreeze" in connection with his selling and distributing of Deepfreeze products, but neither Goodman nor Morrison testified that it was agreed that the right to use the word "Deepfreeze" extended beyond the period of the distributorship, or that there was any right in Goodman to use the word "Deepfreeze" in any respect or situation other than as a distributor of products manufactured and sold by Deepfreeze Division of Motor Products Corporation. It was admitted on the trial that the word "Deepfreeze" had been registered by Motor Products Corporation as a trade-mark in the United States of America and in other countries of the world, that Goodman made no claim to the trade-mark, and that Goodman and Deepfreeze International Corporation now limit their claim to a right to continue the use of the word "Deepfreeze" in a corporate name "Deepfreeze International Corporation."

It is certain that Morrison had no express authority to give away the corporation's property, and there is no implied authority in a department head, or even a general manager, to contract to give another an interest in his principal's business or property. Sacks v. Helene Curtis Industries, Inc., 340 Ill. App. 76, 87; Warszawa v. White Eagle Brewing Co., 299 Ill. App. 509, 517; Howard v. Winton Co., 199 Cal. 374, 249 Pac.

78

511, 512; Deffenbaugh v. Jackson Paper Mfg. Co., 120 Mich. 242, 79 N. W. 197, 198.

■ Trade-marks and trade names are not assignable apart from the right to make or sell the property to which they apply or to continue the business with which they are connected. Disassociated from the thing to which a trade-mark or trade name properly appertains, it becomes a false and deceptive designation. The Fair v. Jose Morales & Co., 82 Ill. App. 499; American Steel Foundries v. Robertson, 269 U. S. 372, 70 L. Ed. 317; Morand Bros., Inc. v. Chippewa Springs Corp. (C.C.A. 7), 2 F.2d 237, 238; Carroll v. Duluth Superior Milling Co. (C.C.A. 8), 232 Fed. 675, 680; Cardinal v. Taylor, 302 Mass. 220, 19 N.E.2d 58, 59; United Razor Blade Corp. v. Akron Drug & Sundries Co., 52 Ohio App. 379, 3 N.E.2d 902, 907; Nims on Unfair Competition and Trade-marks, 4th Ed. Sec. 17.

From an examination of the briefs submitted in this cause, there appears to be little division of opinion as to the soundness of the above proposition. The use of a trade-mark disassociated from the thing to which it properly appertains could serve no honest purpose and result only in misleading the public. The language used in the above cases is peculiarly applicable to the position of Deepfreeze International Corporation. The name of this corporation was originally designed to tell the public that it was engaged in selling and distributing appliances bearing the trade-mark and the trade name "Deepfreeze" and the corporation has never engaged in any business disassociated with the distribution of products bearing this trade-mark and trade name. The very name of this trading corporation, if continued, becomes an instrument of fraud. Deepfreeze International Corporation does not leave any room for doubt that it claims the right to continue to use "Deepfreeze" in its corporate name and that it intends to use the name in marketing products competitive with Deepfreeze Appliances Division of Motor

Products Corporation. Its letter to former distributors dated March 19, 1954, shows that it intends to sell products of other manufacturers of household appliances as Deepfreeze products.

■ When Goodman's distributorship was terminated, the right to use the trade name and trade-mark "Deepfreeze" came to an end. United States Ozone Co. v. United States Ozone Co. of America (C.C.A. 7), 62 F.2d 881, 886–7; Lawrence-Williams Co. v. Societe Enfants Gombault et Cie (C.C.A. 6), 22 F.2d 512; Hicks v. Anchor Packing Co. (C.C.A. 3), 16 F.2d 723, 726; Morand Bros., Inc. v. Chippewa Springs Corp., supra; Adam v. Folger (C.C.A. 7), 120 Fed. 260, 264; A. I. M. Percolating Corp. v. Ferrodine Chemical Corp., 139 Va. 366, 124 S. E. 442, 446; Stratton & Terstegge Co. v. Stiglitz Furnace Co., 258 Ky. 678, 81 S.W.2d 1, 4; Nims on Unfair Competition and Trade-marks, 4th Ed. Sec. 22. The cited cases all reason that to permit the continuing use of a trade name or trade-mark after the termination of a distributorship for the goods to which a trade name or trade-mark would apply would constitute a fraud upon the public and would become an instrument of unlawful interference with the business of the manufacturer.

The purport of these decisions is the same, specific reference being made to Stratton & Terstegge Co. v. Stiglitz Furnace Co., supra, as illustrative of all. There the manufacturer of furnaces sought an injunction against the distributor to restrain it from continuing to use the word "Monarch" as a trade-mark on furnaces sold in Kentucky. The manufacturer agreed to sell its furnaces to the distributor and the distributor was given certain exclusive territory including Kentucky. The prices varied from time to time, but the transactions were straight-out sales and purchases. The distributor established its own selling prices independent of any control of the manufacturer. The

80

furnaces not only bore the trade-mark "Monarch" but also bore the name of the distributor, and the distributor advertised the furnaces extensively during the period of 25 years or more. The distributor's sales were extensive and the public came to understand that the "Monarch" was the distributor's furnace. The manufacturer sold furnaces in other parts of the country and the trade generally knew that it was the manufacturer of the furnaces marked "Monarch." The distributor decided that the manufacturer was not keeping its furnace modernized and it terminated the distributorship and made a contract with another manufacturer to make a furnace for it similar in general construction but different in particular respects, and it gave this new furnace the name "Monarch." After discussing the facts and the applicable law, the court reached the conclusion that the right to use the word "Monarch" in advertising and selling furnaces came to an end when the distributorship was terminated, saying (81 S.W.2d 4):

"When a trade-mark accompanies an article sold or authorized to be sold by another, there can be no separation without deception of the public. The right to its use as licensee expires when the contract covering its use terminates. The consent is withdrawn, and the proprietor is entitled to have his trade-mark back unimpaired. . . . The claims of appellant to the ownership of and right to use the trade-mark are not convincing. Such claims as it had originated in the sales agency contracts wherein it was given exclusive sales rights, and, solely for the purpose of the contract, was permitted to use the trade-mark in advertising and selling the products manufactured by its owner. Nothing appears in the contract or elsewhere which indicates any intention of the parties, respectively, to give up or to take over the trade-mark "Monarch" except for the limited purposes of their contract.

81

When that contract came to an end, appellant's rights to any use of the mark likewise came to an end."

 Count IV of the complaint shows that Goodman and Deepfreeze International Corporation started out with the assumption that they could exclude Motor Products Corporation from the use of its registered trade-mark and advertise the trade name "Deepfreeze" in any part of the world outside the United States of America. Now Goodman asserts his claim to a right to continue to use the word "Deepfreeze" in the corporate name "Deepfreeze International Corporation." The very fact that Goodman claims such right is the strongest evidence of the purpose which prompts the claim. The law is well settled that a corporate name cannot be used in a manner which will result in fraud and deception. Allegretti v. Allegretti Chocolate Cream Co., 177 Ill. 129, 132–3; Bender v. Bender Store & Office Fixture Co., 178 Ill. App. 203, 207; Children's Bootery v. Sutker, 91 Fla. 60, 107 So. 345, 349; Higgins Co. v. Higgins Soap Co., 144 N. Y. 462, 39 N. E. 490, 491; Cardinal v. Taylor, supra; American Steel Foundries v. Robertson, supra; Rice & Hutchins v. Vera Shoe Co. (C.C.A. 2), 290 Fed. 124, 126; J & P Coats v. John Coates Thread Co., 135 Fed. 177, 179; Celluloid Mfg. Co. v. Cellonite Mfg. Co., 32 Fed. 94, 97.

Bender v. Bender Store & Office Fixture Co., supra, (following Allegretti v. Allegretti Chocolate Cream Co., supra) states with respect to the right to continue to use a deceptive corporate name (p. 207):

"It is true, persons seeking to form a corporation may ordinarily choose any name their fancy dictates, subject, however, to the rule that they may not choose the name of a corporation already existing, or one that is to be used to deceive the public, or to be passed off for that of some other person or firm in business. (Citations) When a corporation violates that rule, it does so at its peril. Neither does the fact that the state issues a charter to a corporation by a certain name

give to such corporation a right to use it, if it was deliberately chosen, or is used for the purpose of deceiving the public and thereby appropriating the business of another. (Citations) When such unfair name is selected by a corporation for the purpose of deceiving the public into the belief that its goods are the goods of another, the use of that name for that means will be enjoined. (Citations) We think the rule goes even further and is that when the use of a name results in the palming off of one's goods on the public as the goods of another, the use of such name will be enjoined. (Citations)"

In the instant case, plaintiff was accorded the privilege of using defendant's registered and established trade name in marketing defendant's products and plaintiff never had any property rights in the name apart from his permissive use of the name as a distributor of defendant's products. The name "Deepfreeze" was identified with defendant's products before Goodman had any rights as a distributor. There was no assignment to him of any property rights in the name.

██ On the equitable relief sought by plaintiff in Count IV of his complaint and on the equitable relief sought by defendant in its counterclaim, it was the duty of the Trial Court to weigh the evidence. He saw and heard the witnesses. Unless his findings are against the manifest weight of the evidence we would not be warranted in disturbing the judgment. Haddad v. Marble, 328 Ill. App. 315, 65 N.E.2d 575; Mayflower Sales Co. v. Frazier, 325 Ill. App. 314; Roberts v. City of Rockford, 296 Ill. App. 469; Keefer Coal Co. v. United Elec. Coal Companies, 291 Ill. App. 477. When testimony is contradictory, it is well established that, in a hearing before the court without a jury, whether at law or in equity, the determination of the credibility of witnesses and the weight to be afforded their testimony are matters for the Trial Court, and its findings will

not be disturbed unless they are manifestly against the weight of the evidence. Eleopoulos v. City of Chicago, 3 Ill.2d 247 at p. 253; Wynekoop v. Wynekoop, 407 Ill. 219; Schnepper v. Ashlock, 404 Ill. 417; Sohio Corp. v. Gudder, 375 Ill. 622; Flynn v. Troesch, 373 Ill. 275; Dalbey v. Hayes, 267 Ill. 521; Zimmerman v. Zimmerman, 242 Ill. 552; Beall v. Dingman, 227 Ill. 294; Manley v. Geng, 7 Ill.App.2d 6; Glasser v. Essaness Theatres Corp., 346 Ill. App. 72. We are of the opinion that the Trial Court's findings as to Count IV of the complaint and as to the counterclaim, wherein equitable relief was sought by the parties, are amply supported by the evidence in this case. We find no error in the Trial Court's ruling dismissing Count IV of plaintiff's complaint for want of equity, and in granting the relief prayed for by defendant in its counterclaim.

■ ■ We are of the opinion that the Trial Court erred in granting the motion for judgment notwithstanding the verdict, as said motion presents the single question whether there is in the record any evidence which, standing alone and taken with all its intendments most favorable to the party resisting the motion, tends to prove the material elements of his case. Wiik v. Hagen, 410 Ill. 158 at p. 161; Seeds v. Chicago Transit Authority, 409 Ill. 566; Lindroth v. Walgreen Co., 407 Ill. 121 at p. 130; Gorczynski ·v. Nugent, 402 Ill. 147 at p. 156; Weinstein v. Metropolitan Life Ins. Co., 389 Ill. 571 at p. 576. We are not concerned with the weight or credibility of the evidence, but only with the narrow question whether there is any evidence, together with all reasonable inferences to be drawn therefrom, which would justify submission of the case to the jury. Lindroth v. Walgreen Co., supra, at p. 130. In passing on a motion for a judgment notwithstanding the verdict, the court must consider all the evidence with all reasonable inferences therefrom in the aspect most favorable to the party against whom the motion is directed, and all contradictory or explanatory cir-

84

cumstances must be rejected. Baker v. City of Granite City, 311 Ill. App. 586.

From the evidence in this case it appears that plaintiff Goodman for many years had been devoting part of his time and attention to the interests of himself and of the defendant; that as a result of his said efforts, many of defendant's articles of merchandise were sold; that up to the time of the notice of the termination of the alleged contract existing between the parties, plaintiff had earned monies for the services he performed under said alleged contract. Assuming that the contract was terminable upon giving reasonable notice, the evidence, when taken in its light most favorable to the plaintiff discloses that the contract was recognized by defendant in its letter of July 29, 1953; and the evidence further shows that the contract was breached by defendant prior to notice of termination, and prior to the date of termination as fixed by defendant in its said notice. It appears that direct sales into Mexico were made by defendant, and this constituted an invasion of plaintiff's exclusive territory. Marshall v. Canadian Cordage & Manufacturing Co., 160 Ill. App. 114, 119; Koehring Mach. Co. v. Chicago Builders Specialties Co., 117 Ill. App. 100, 102; Illsley v. Peerless Motor Car Co., 195 Ill. App. 572 (1916), modifying 177 Ill. App. 459 (1913). The record here presents sufficient evidence to go to the jury, and we are of the opinion that the motion for judgment notwithstanding the verdict was improperly granted and that the court erred in entering judgment against plaintiff and in ordering that plaintiff take nothing by his suit against the defendant.

The plaintiff, Manuel Goodman, argues that the jury's verdict is a conservative determination of the damage sustained by plaintiff under instructions favorable to the defendant and that the Trial Court erred in granting the alternative motion for new trial

and that the verdict of the jury should be reinstated. In reviewing an order of the Trial Court granting a new trial where the question of the weight of the evidence is involved, the reviewing court will not disturb the order in the absence of an affirmative showing of a clear abuse of discretion. Warren v. Patton, 2 Ill.App. 2d 173, 179; Eckhardt v. Hickman, 349 Ill. App. 474, 483; Matkins v. Fenorsky, 348 Ill. App. 125, 129; Chapman v. Baltimore & O. R. Co., 340 Ill. App. 475, 499, 500. The matter of granting a new trial is in the sound discretion of the trial judge. Parke v. Lopez, 306 Ill. App. 486; Ledferd v. Reardon, 303 Ill. App. 300; Josate v. Mack, 302 Ill. App. 246. As was said in Josate v. Mack, supra, at p. 248: "Necessarily, the trial court should have the discretion to decide with finality whether a new trial is necessary in the interests of justice, as it is in his power to observe the multiplicity of situations as they arise during the progress of the trial and is in a better position to weigh the effect upon the jury and to judge whether or not substantial justice had been done." On the question of the evidence, the trial judge must be accorded considerable discretion, and his judgment is accorded greater latitude than on questions of law. Loucks v. Pierce, 341 Ill. App. 253. The presiding judge in passing upon the motion for new trial has the benefit of his previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility. The trial judge is in a better position than a court of review to weigh the evidence. The allowance or refusal of the motion is largely within the discretion of the Trial Court. His decision is subject to review, but it is commonly said that it will not be reversed except for a clear abuse of discretion. Gavin v. Keter, 278 Ill. App. 308; In re Estate of Velie, 318 Ill. App. 550; Chapman v. Baltimore & O. R. Co., supra; Matkins v. Fenorsky, supra. Considering that the record in this case is voluminous,

consisting of more than 1,000 pages, not including two score and more of exhibits, and that testimony was heard extending over several days, we would hesitate to say that the Trial Court's action in granting the alternative motion for new trial was a clear abuse of discretion. We are of the opinion that the Trial Court properly allowed the motion for new trial in this cause and said order is affirmed.

For the error of the Trial Court in granting the motion for judgment notwithstanding the verdict, said judgment is reversed and the cause remanded for a new trial.

Affirmed in part, reversed in part and remanded.

DOVE, P. J. and CROW, J., concur.