Richard A. SPIERING et al., Plaintiffs-Appellants,

v.

FAIRMONT FOODS COMPANY, Inc., Defendant-Appellee.

No. 17733.

United States Court of Appeals, Seventh Circuit.

March 25, 1970.

Rehearing Denied June 2, 1970.

Ira Marcus, Morrie Much, Chicago, Ill., for plaintiffs-appellants; Raynor Mitchell & Much, Chicago, Ill., of counsel.

Thomas P. Sullivan, David C. Roston, Chicago, Ill., for defendant-appellee; Jenner & Block, Chicago, Ill., of counsel.

Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge, and FAIRCHILD, Circuit Judge.

CASTLE, Senior Circuit Judge.

Plaintiffs brought this action in the district court to recover damages from defendant for alleged breaches of contract and to obtain specific performance of that contract regarding distribution of the latter's dairy products. The individual plaintiffs are milk route retail salesmen who formed a partnership, plaintiff Paramount Milk Distributors, as a vendor of Fairmont's bottled milk and milk products.

The relationship between the parties began in 1961, when plaintiffs picked up dairy products at Fairmont's suburban plant and delivered them to consumers in the Chicago area. Late in that year, the parties orally agreed to a plan whereby Paramount opened and operated a loading dock facility in Chicago[1] and solicited other retail vendors to purchase Fairmont's products from the Chicago facility. Paramount received a special dock price (initially around 48 cents per gallon) which enabled it to profit by receiving the difference between that price and the regular wholesale price (58 cents per gallon) charged to the vendors solicited by Paramount. The arrangement between Paramount and Fairmont was kept secret since the other vendors were bound by union rules which prohibited one vendor from selling to another. Accordingly, Fairmont, and not Paramount, billed the other vendors and remitted a commission to Paramount, representing the difference between the latter's special dock price and the regular price. The other vendors apparently believed they were buying directly from Fairmont.

This arrangement lasted until April, 1965, at which time Paramount had five vendors, plus the three individual plaintiffs, allegedly purchasing a total of 60,000 quarts of milk per week from the Chicago facility. The parties had originally expected around twenty vendors to be purchasing from the facility. On April 4, 1964, Fairmont notified plaintiffs that it was terminating Paramount's Distributorship arrangement and intended to operate the Chicago facility itself. Fairmont offered plaintiffs two alternatives for future operations. Paramount could continue operating and paying expenses for the Chicago facility, and could keep serving the eight vendors then using the facility, but would forego soliciting new vendors. Alternatively, Paramount would have no part in the operation of the facility and the servicing of the five other vendors, but would continue to receive the special discount price from Fairmont. Plaintiffs agreed to the second alternative. No writing was ever drawn to incorporate this agreement. While plaintiffs claim that the discount was to last as long as they remained milk vendors in Chicago, Fairmont contends that the arrangement was for an indefinite period of time and could be terminated at the will of either party. In December, 1965, Fairmont, which was losing money on its Chicago

---

1. This facility included a flatbed trailer, temporary refrigerating apparatus, and a shack in a vacant lot, which were leased from an adjacent gas station. The facility was used only in the early morning hours when Fairmont would deliver milk in its trucks and plaintiffs would distribute it to their trucks and those of their customers.

operations, sold those operations to Pure Milk Association. A few months thereafter, plaintiffs were informed by Pure Milk that they would no longer receive the special discount price.

Plaintiffs' complaint contained three counts. The first charged that Fairmont unlawfully terminated the original distributorship agreement. The district court, in granting summary judgment for Fairmont, rejected this claim and found that the agreement was terminable at will, with reasonable notice.[2] Plaintiffs have not appealed from that ruling. Count II charged wrongful termination of the April, 1965 agreement. The court below found that this agreement was within the statute of frauds and therefore unenforceable. This appeal is from that finding. Count III, claiming certain union benefits and advertising allowances, and the counterclaim, for a sum due for goods delivered to plaintiffs, were held to present triable issues of fact and summary judgment was denied.

The main issue presented on appeal is whether or not the April 1965 agreement fell within a statute of frauds so as to render it unenforceable. Plaintiffs contend that the agreement constituted a contract for the sale of a "service business"—namely, the transferring of Paramount's five vendors, goodwill, records, and "other equipment"—and thus was not within the statute of frauds contained in § 2–201 of the Uniform Commercial Code (Ill.Rev.Stat., ch. 26, § 2–201),[3] since it was not a contract for the sale of "goods."

This argument overlooks the fact that the district court found—and plaintiffs do not contest—that Fairmont properly terminated its original distributorship agreement with Paramount. This termination deprived plaintiffs of any "service business" they might have once possessed. When plaintiffs lost the right to sell Fairmont's milk to the other vendors, the only contract between the parties was one enabling plaintiffs to purchase milk at a particular price. Since milk comes within the definition of "goods" contained in U.C.C. § 2–105,[4] and since any single day's milk sales exceeded the value of $500, the agreement fell within the statute of frauds of § 2–201. The partial performance consisting of Fairmont's delivery of milk to plaintiffs from April to December, 1965,

2. As authority for this holding, the district court cited Ill.Rev.Stat., ch. 26, §§ 2–309(2), (3); Joliet Bottling Co. v. Joliet Citizens Brewing Co., 254 Ill. 215, 98 N.E. 263 (1912); Goodman v. Motor Products Corp., 9 Ill.App.2d 57, 132 N.E.2d 356 (2d Div. 1956).

3. § 2–201 provides in pertinent part:
(1) Except as otherwise provided in this Section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.
       *       *       *       *       *
(3) A contract which does not satisfy the requirements of subsection (1)

but which is valid in other respects is enforceable
       *       *       *       *       *
(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or
(c) with respect to goods for which payment has been made and accepted or which have been received and accepted (Section 2–606).

4. § 2–105 provides in pertinent part:
"Goods" means all things, including specially manufactured goods, which are moveable at the time of the identification to the contract for sale other than the money in which the price is to be paid   *   *   *.
This and all subsequent reference to sections of the Uniform Commercial Code refer to the corresponding sections of Chapter 26, Illinois Revised Statutes.

did not take the entire contract out of the statute of frauds under § 2–201(3)(c), since that section provides that a contract is taken out of the statute only as to goods "which have been received and accepted." [5]

The thrust of Count II of plaintiffs' complaint is that they were allegedly induced to voluntarily terminate their prior agreement with Fairmont in return for the latter's promise to continue to sell milk to them at the special discount, when Fairmont actually contemplated selling its business to Pure Milk. Plaintiffs argue before this Court that they had fully performed their obligations under the April, 1965 agreement and thus § 2–201(3) (c) takes the entire contract out of the statute. Plaintiffs also contend that a question of fact was presented which could not be disposed of by summary judgment.

First, we fail to see how plaintiffs could have performed an agreement which allegedly required them to convey something which they did not possess. Plaintiffs never owned rights in any of the milk routes they serviced other than the three they operated themselves. Nor were the five other vendors under any obligation to purchase milk from the plaintiffs. In addition, due to the surreptitious nature of plaintiffs' agreement with Fairmont, no valuable goodwill could have been built up with the other five vendors, since they believed they were dealing with Fairmont. Fairmont had the right to, and in fact did, terminate its prior arrangement with the plaintiffs. Any reasonable notice required for such termination was amply fulfilled by the eight months of continued discounts received by plaintiffs from April to December, 1965.

■ Second, we find that the case was properly disposed of by summary judgment. Summary judgment may properly be entered only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.Rules Civil Proc.; Jeute v. Jarnowski, 393 F.2d 513, 515 (7th Cir. 1968). In the instant case, the elements necessary to sustain the holding of the district court on Count II are undisputed. Thus, it is uncontested that: the prior distributorship agreement was properly terminated by Fairmont; the other vendors serviced by Paramount believed they were dealing with Fairmont and were under no obligation to purchase their milk from plaintiffs; both the 1961 and the April, 1965 agreements were oral; Fairmont continued to give plaintiffs the special discounts from April to December, 1965, and each individual plaintiff received between $4000 and $11,400 in discounts under the April, 1965 agreement.[6] The only fact left in dispute— the duration which the special discounts were to last—is immaterial to the issue of whether the contract falls within § 2–201.

■ We are of the opinion that this record refutes plaintiffs' contention that there remained a triable question of whether or not Paramount had a service business or anything of value to transfer to Fairmont after the termination

---

5. Fairmont, in its brief, argues that if, in the alternative, the April, 1965 agreement is held to have been for the sale of a "service business," the contract falls under U.C.C. § 1–206, which provides:

* * * [A] contract for the sale of personal property [except as provided in Sections 2–201, 8–319 and 9–203] is not enforceable by way of action or defense beyond $5,000 in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent.

Since we hold that the contract falls within § 2–201, we need not reach this contention. Similarly, we express no opinion on Fairmont's contention that the agreement was terminable at will, with reasonable notice, as a contract "indefinite in duration" under U.C.C. § 2–309.

6. These figures are recited in the memorandum opinion of the district court and have not been disputed on appeal.

of the prior arrangement, so as to have fully performed its obligation under the April, 1965 agreement. Plaintiffs did not and could not have transferred to Fairmont the right to sell to the five vendors, any property rights in the routes of those vendors, any valuable equipment (the Chicago premises were leased), or any valuable goodwill. We agree with the district court that whatever slight value Fairmont might have received was amply paid for by the continued discounts given to the plaintiffs for the eight months after the termination of the prior arrangement. We conclude, then, that plaintiffs' "transfer" fell far short of the full performance necessary under the Uniform Commercial Code to take the entire contract out of the statute of frauds.

The judgment below is affirmed.

Affirmed.