**ZENITH VINYL FABRICS CORP., a New Jersey corporation, Plaintiff,**

v.

**FORD MOTOR COMPANY** and Eltra Corp., successor to Electric Autolite Company, Defendants.

Civ. A. No. 28333.

United States District Court,

E. D. Michigan, S. D.

April 11, 1973.

Allan Neef, Darden, Neef & Heitsch, Detroit, Mich., Adelman & Lavin, Philadelphia, Pa., for plaintiff.

P. Joseph Pascoff, Kerr, Wattles & Russell, Detroit, Mich., for defendant Electric Autolite Co.

F. Bruce Kulp, Ford Motor Co., Dearborn, Mich., for defendant Ford Motor Co.

KAESS, Chief Judge.

This civil action has been brought pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15) to recover treble damages for alleged violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 7 of the Clayton Act (15 U.S.C. § 18).

Defendant Ford has brought this motion for summary judgment. Rule 56, Federal Rules of Civil Procedure.

In the spring of 1959, Albert Neulicht, a chemical engineer, was production manager for Lyntex Corporation, a Massachusetts corporation, which produced vinyl film. At that time, Melvin Sobel was a distributor of vinyl film.

In April or May of 1959, plaintiff alleges that these individuals conceived the idea of assisting Defendant Ford in rehabilitating an inoperative calender line at the latter's plastic plant, making arrangements to purchase a portion of the production of unsupported vinyl film from the rehabilitated calender line and selling this film on the open market. To accomplish this goal, Sobel and Neulicht formed plaintiff corporation, and are its sole stockholders.

Negotiations ensued for approximately one year and culminated in a contract dated June 1, 1960, between Plaintiff Zenith Vinyl Fabrics Corp. and Defendant Ford Motor Company. Under the terms of this contract, Ford would sell unsupported vinyl to Zenith. Contrary to plaintiff's assertions, this contract does not give Zenith any right to distribute all vinyl products produced by Ford in the automobile aftermarket. According to plaintiff's complaint, the sole business of Plaintiff Zenith has been to assist Defendant Ford in making its then inoperative calender line productive, supplying Defendant Ford with formulas necessary to make various types of unsupported vinyl film for non-automotive outside sales, training Defendant Ford's personnel in the techniques of the production of unsupported vinyl film on the calender line, purchasing said film from Defendant Ford, and selling same to Zenith's customers on the open market.

Plaintiff claims that, for approximately seventeen (17) months, Albert Neulicht worked constantly with Defendant Ford, the Production Manager of its Plastics Plant, and other officers and employees, to get the calender line operating, did the necessary experimenting and research to learn the proper formulas for the manufacture of unsupported vinyl film for non-automotive purposes, trained Defendant Ford's employees in the operation of the calender line and manufacture of unsupported vinyl film for non-automotive purposes.

On April 12, 1961, Ford and Electric Autolite entered into an agreement

whereby they acquired some of the manufacturing facilities, all the customer lists and outstanding agreements with distributors. On November 8, 1961, Zenith entered into a new contract with Ford whereby Zenith was designated national distributor for unsupported vinyl film. The parties operated under this contract until November 2, 1962, at which time Ford terminated the agreement, pursuant to the termination clause in the November 8, 1961 agreement. The reason given for termination was discontinuance of "any definite unsupported film program".

On April 2, 1963, plaintiff filed this antitrust action in the District Court for the Eastern District of Pennsylvania. On May 5, 1963, Zenith voluntarily dismissed the action, but reinstituted it in October, 1965. On March 23, 1966, this action was transferred from the Eastern District of Pennsylvania to this District. Since that time, this case has not been actively pursued, by mutual agreement of the parties, pending the final outcome of a suit by the Government to force Ford to divest itself of Autolite.

■ Generally, summary judgment should be used sparingly in antitrust litigation. Poller v. Columbia Broadcast System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Alles Corp. v. Senco Prods. Inc., 329 F.2d 567 (6th Cir. 1964).

However, this does not mean that Rule 56 of the Federal Rules of Civil Procedure is inapplicable in antitrust cases; and, when appropriate, summary judgment may be granted. First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Daily Press, Inc. v. United Press International, 412 F.2d 126 (6th Cir. 1969).

With this in mind, the Court will now consider Defendant Ford's motion.

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

■ It is now settled that a private litigant can maintain an action under Section 4 of the Clayton Act (15 U.S.C.A. § 15) for a violation of Section 7. See Gottesman v. General Motors Corp., 414 F.2d 956 (2nd Cir. 1969); Dailey v. Quality School Plan, Inc., 380 F.2d 484 (5th Cir. 1967); Kirihara v. Bendix Corp., 306 F.Supp. 72 (D.C.Haw.1969); Julius M. Ames Co. v. Bostitch, Inc., 240 F.Supp. 521 (D.C.N.Y.1965); Isidor Weinstein Investment Co. v. Hearst Corp., 310 F.Supp. 390 (D.C.Cal.1969); Metropolitan Liquor Co., Inc. v. Heublein, Inc., 305 F.Supp. 946 (D.C.Wis. 1969); this conclusion is also implicit in the Supreme Court's decision in Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 85 S. Ct. 1473, 14 L.Ed.2d 405 (1965).

Section 4 of the Clayton Act expressly restricts the right to sue for treble damages to suits based on injuries which occur "by reason of" antitrust violations. Thus, it has been held that a plaintiff must allege and prove that the violation of the antitrust laws injured his competitive position in the business in which he is or was engaged. See, e.g., United Copper Securities Co. v. Amalgamated Copper Co., 232 F. 574, 577 (2nd Cir. 1916); Westmoreland Asbestos Co. v. Johns-Manville Corp., 30 F.Supp. 389, 391 (S.D.N.Y.1939), aff'd 113 F.2d 114 (2nd Cir. 1940); Monticello Tobacco Co. v. American Tobacco Co., 197 F.2d 629, 632 (2nd Cir.), cert. den. 344 U.S. 875, 73 S.Ct. 168, 97 L.Ed. 678 (1952); Productive Inventions, Inc. v. Trico Prods. Corp., 224 F.2d 678, 679 (2nd Cir. 1955), cert. den. 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956); SCM Corp. v. Radio Corp. of America, 407 F.2d 166, 171 (2nd Cir.), cert. den. 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969); Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183, 187 (2nd Cir. 1970), cert. den. 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); GAF Corporation v. Circle

Floor Co., Inc., 463 F.2d 752 (2nd Cir. 1972).

In addition, plaintiff must establish that the alleged violation of the antitrust laws was a "material cause" of or a "substantial factor" in the occurrence of his injury. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 702, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L. Ed. 652 (1946); Note, Standing to Sue for Treble Damages Under Section 4 of the Clayton Act, 64 Colum.L.Rev. 570, 575–6 (1964). Moreover, this causal connection must link a specific form of illegal act to a plaintiff engaged in the sort of legitimate activities which the antitrust laws were intended to protect. Certainly, any antitrust violation disrupts the competitive economy to some extent and creates ripples of injury which may be shown to reach individual employees, stockholders, or consumers. However, it has long been held that not all of these have the requisite standing to sue for treble damages and thereby take a leading role in the enforcement of the prohibition in question. See, e. g., Data Digests, Inc. v. Standard & Poor's Corp., 43 F.R.D. 386 (S.D.N.Y.1967). The private action, intended as "an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws", Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed. 2d 982 (1968), can only serve as an effective deterrent if the courts are able to administer it with some degree of certainty. Overly broad rules of causation can only lead to a relaxation of the standard of business behavior which is sought to be maintained by the allowance of treble recovery. Consequently, a plaintiff must allege a causative link to his injury which is "direct" rather than "incidental" or which indicates that his business or property was in the "target area" of the defendant's illegal act. SCM Corp. v. Radio Corp. of America, 407 F.2d 166 (2nd Cir.), cert. den. 395 U.S. 943, 89 S.Ct.

2014, 23 L.Ed.2d 461 (1969); Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2nd Cir. 1955), cert. den. 350 U.S. 936, 76 S.Ct. 301, 100 L. Ed. 818 (1956). Of course, these rules do not provide talismanic guides to decision, but they do indicate the need to examine the form of violation alleged and the nature of its effect on a plaintiff's own business activities. See, generally, Pollock, Standing to Sue, Remoteness of Injury, and the Passing-On Defense, 32 A.B.A. Antitrust L.J. 5 (1966); Timberlake, Federal Treble Damage Antitrust Actions, §§ 4.02, 4.03 (1965).

This requirement of proof of a causal connection applies to violations of Sections 1 and 2 of the Sherman Act as well as violations of Section 7 of the Clayton Act. GAF Corporation v. Circle Floor Co., Inc., 463 F.2d 752 (2nd Cir. 1972).

At the outset, this Court feels it is well to state what this case does and does not involve. The pleadings and affidavits filed in this case make abundantly clear that this case deals only with "unsupported vinyl films". This conclusion is reinforced by an examination of the two contracts entered into by the parties.

The fact that Ford has been found to have violated Section 7 of the Clayton Act by virtue of its acquisition of certain assets of Autolite proves nothing for Zenith's case. The District Court's holding in the divestiture case was limited to batteries and spark plugs. United States v. Ford, 286 F.Supp. 407 (E.D.Mich.1968). The Supreme Court's decision was limited to spark plugs. Ford v. United States, 405 U.S. 562, 92 S.Ct. 142, 31 L.Ed.2d 492 (1972). The affidavits submitted by Ford clearly establish that there is no causal connection between Ford's acquisition of Autolite and plaintiff's subsequent demise. These affidavits show that Autolite was never involved in the manufacture, sale, or distribution of vinyl products prior to its acquisition (Stroh, para. 3), and at no time thereafter were the assets ac-

quired ever used for such a purpose (Hodge, para. 5). Moreover, vinyl fabrics sold by Ford were never sold under the trademark "Autolite". They were sold as "Ford Fabrics". The Sales Manager of Vinyl Operations states that, "the use of the Autolite name would have added little to vinyl sales and perhaps would have impeded sales and confused potential customers". (Scholz, para. 5). These facts clearly establish that plaintiff was not the "target area" of defendant's alleged illegal acts.

The unrefuted statements in the affidavits reveal that unsupported vinyl films manufactured by Ford were used only for non-automotive applications (Fleming, para. 8). Moreover, in the 10-year period from 1961 to 1971, Ford's share of industry sales for both supported and unsupported vinyl products has been less than one per cent. In the same period, the sales of unsupported vinyl products by Ford Fabrics never exceeded one-tenth of one per cent of industry sales. This indicates that vinyl sales could not have been an important consideration in Ford's acquisition of Autolite.

This conclusion is reinforced by the affidavit of one of the principal negotiators involved in the sale of the assets by Autolite, who specifically states that at no time was the manufacture and sale of vinyl products considered in the negotiations for the acquisition of Autolite (Stroh, para. 2).

Against this factual background, there can be no basis for a finding that the acquisition of Electric Autolite by Ford proximately caused damage to Zenith. Therefore, unless plaintiff's affidavit sets forth specific facts showing that there is a genuine issue for trial, summary judgment must be granted. Rule 56(e), Federal Rules of Civil Procedure.

In response to defendant's affidavits, plaintiff has submitted but one affidavit, that of Melvin Sobel, one of the two stockholders of Zenith Vinyl Fabrics Corp. In large measure, Sobel's affidavit merely restates the allegations in the complaint. For example, compare paragraph 2 of the affidavit with paragraph 11 of the complaint, and paragraph 4 of the affidavit with paragraphs 6 and 15 of the complaint. In addition, paragraphs 4, 5, 6, 7 and 8 of Sobel's affidavit are for the most part conclusory, and do not set forth specific facts as required by Rule 56(e) of the Federal Rules of Civil Procedure. Also, the statements in paragraph 3 of the affidavit are clearly wrong, since the contract of June 1, 1960, did not give plaintiff the right to distribute all vinyl products, but, rather, was a sales agreement under which Ford would sell and Zenith would buy unsupported vinyl film.

In paragraph 7 of Sobel's affidavit, he claims that all of Zenith's accounts were taken over by Ford. However, there are no affidavits from any of Zenith's customers to corroborate this conclusion. In fact, Sobel, in his deposition of December 5, 1972, admitted that Ford did not take away any of Zenith's customers (p. 22) (see also p. 52 of Sobel's Deposition of October 10, 1966).

■ There is substantial authority to the effect that an affidavit which merely restates the allegations of the complaint should be disregarded. For example, Moore takes the position that ". . . restatements of the parties' own allegations in the affidavits should be disregarded by the courts".

In Engl v. Aetna Life Ins. Co., 139 F. 2d 469 (2nd Cir. 1943), the plaintiff, in opposition to a motion for summary judgment, merely asserted that she would have evidence at trial to refute defendant's contentions. In affirming summary judgment for the defendant, the court stated, at page 473:

"If one may thus reserve one's evidence when faced with a motion for summary judgment there would be little opportunity 'to pierce the allegations of fact in the pleadings' or to determine that the issues formally raised were in fact sham or otherwise unsubstantial . . .

"So easy a method of rendering useless the very valuable remedy of summary judgment is not suggested in any part of its history or in any one of the applicable decisions."

In Belanger v. Hopeman Bros., 6 F.R. D. 459 (S.D.Maine 1947), the defendant moved for summary judgment, supporting the motion with an affidavit which merely reasserted certain defenses. In denying the motion, the court discussed Rule 56(e) as follows:

"Its purpose is to enable parties to a case in court, by filing pleadings, affidavits and admissions, or otherwise, to squeeze out of the case all matters in controversy, except the law, and to authorize the court to give judgment on undisputed facts. But that is not accomplished by merely re-asserting in affidavit form a defense already set up in the answer. An assertion which amounts to nothing more than a denial of the existence of the statutory situation which creates the right of action does nothing to lessen the issues involved, unless admitted. *A party to an action cannot push the other party out of court by swearing he has no case.*" 6 F.R.D. at 461. (Emphasis added).

These principles are equally applicable to this situation. To find that Mr. Sobel's affidavit forms a sufficient basis to deny Ford's motion for summary judgment would amount to permitting the plaintiff to keep its case in court merely by swearing that it has a case.

Also, in Moore v. North American Rockwell Company, Civil No. 36297, 16 F.R.S.2d 145 (E.D.Mich.1972), the court, in granting the defendant's motion for summary judgment, stated:

"In the affidavit before this court, plaintiff has merely restated the conclusory allegations of his complaint or has simply denied the truth of defendant's affidavits. Having stated only conclusions, his affidavit does not by itself create any issues of fact which would make summary judgment inappropriate." 16 F.R.Serv.2d at 146

See, also, Donnelly v. Guion, 467 F.2d 290 (2nd Cir. 1972).

In view of these considerations, the court finds that plaintiff's affidavit does not conform with the requirements of Rule 56(e) of the Federal Rules of Civil Procedure.

Furthermore, the pleadings and depositions filed in this case do not indicate any issues of material fact. For example, paragraph 14 of plaintiff's complaint makes the following allegations:

"14. Further, the said agreement violated Section 1 and 2 of the Sherman Act and Section 7 of the Clayton Act among other ways as follows:

a. Defendants have engaged in a conspiracy to monopolize the sale and distribution of automotive products and related non-automotive products in order to control prices of said products in restraint of trade.

b. Defendants by said agreement have substantially lessened competition in the sale and distribution of non-automotive products.

c. Ford's advantage in the selling field has worked to the detriment of small firms in general and Zenith in particular as more fully set forth in the following paragraphs.

d. Competition generally in the manufacture, distribution and sale of automotive and related non-automotive products is substantially lessened.

e. Concentration in production, distribution and sale of automotive and non-automotive products has been substantially increased to the detriment of actual and potential competition in general and Zenith in particular.

f. Defendants by said agreement have conspired to monopolize the manufacture, distribution and sale of automotive and related non-automotive products to the detriment of competition in general and Zenith in particular as hereinafter set forth."

On October 10, 1966, Mr. Sobel was questioned concerning these allegations. At page 33 of his deposition, the following exchange took place:

"Q Do you have personal knowledge of facts which support the conclusions in paragraph 14a through f.?

A I have no personal facts other than those facts related to Zenith Vinyl Fabrics.

Q What facts are those?

A That Ford formed an Autolite Division in April of 1961, and prior to that, Ford was not selling vinyl, and after that, they were selling vinyl, and after our contract was terminated, they were still in the vinyl business. Other than the facts relating to Zenith, I have no other.

Q But it is also your testimony, is it not, Mr. Sobel, that you can't identify any assets acquired by Ford from Autolite which were in fact used in the Autolite Division of the Ford Motor Company?

A I cannot identify any assets.

Q Referring back to the same paragraph 14, can you identify any person who has knowledge of facts which support the conclusions of paragraph 14?

A Mr. Lashner.

Q Other than Mr. Lashner?

A I don't know other than Mr. Lashner, I don't know of anybody."

These statements by Sobel are typical of plaintiff's entire case. No affidavit has been submitted by Mr. Lashner. No other affidavits or documents have been filed in support of Sobel's allegations. To find a violation of the antitrust laws based on this type of statement would require the Court to pile inference upon innuendo upon speculation. This the Court is unwilling to do.

Plaintiff claims that the acquisition of Autolite by Ford was for the purpose of allowing Ford to occupy a strong position in the so-called "automobile aftermarket". Plaintiff further contends that Ford's acquisition of Autolite was intended to deprive plaintiff of its rightful share of this automobile aftermarket. It is, of course, true that Ford did desire to occupy a strong position in the automobile aftermarket. But only with respect to spark plugs and batteries. United States v. Ford, 286 F.Supp. 407 (D.C.Mich.1968).

■ Furthermore, plaintiff has not produced any evidence by affidavit or otherwise which would indicate that it ever sold unsupported vinyl film in the "automobile aftermarket". Moreover, Sobel, in his deposition of December 5, 1972, admits that he does not know whether Autolite sold vinyl products in the aftermarket (p. 22). The affidavits submitted by Ford clearly show that Autolite never sold unsupported vinyl film in the automobile aftermarket (Hodge, para. 5). Obviously, plaintiff cannot have suffered an injury by reason of a loss of something which it never had in the first place.

■ Plaintiff also claims that Ford's refusal to sell vinyl to it was a violation of the antitrust laws. However, a refusal to deal in and of itself is not a violation of the Sherman Act. Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963). A manufacturer has a right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. A refusal to deal becomes illegal under the Act only when it produces an unreasonable restraint of trade, such as price fixing, elimination of competition, or the creation of a monopoly. United States v. Parke, Davis & Co., 362 U.S. 29, 32, 80 S.Ct. 503, 4 L.Ed.2d 505; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162. The fact that a refusal to deal with a particular buyer without more,

may have an adverse effect upon the buyer's business does not make the refusal to deal a violation of the Sherman Act. Damage alone does not constitute liability under the Act.

The present case does not involve price fixing. Nor does it involve an attempt to create a monopoly. Unless it can be said that the refusal to deal with plaintiff had the result of suppressing competition, and thus constituted "restraint of trade" within the meaning of Section 1 of the Sherman Act, there is no violation of the Act.

It is also obvious that plaintiff did not go out of business because of any alleged violation of the antitrust laws by Ford. After Ford terminated the November 8, 1961 agreement, plaintiff did not seek another source of supply. Instead Sobel and Neulicht simply "let plaintiff die" and formed a new corporation to carry on the vinyl business (p. 66–68 of Sobel's Deposition of December 5, 1972).

In First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Supreme Court made it clear that allegations of restraint of trade must be supported by significant probative evidence in order to overcome a motion for summary judgment. Plaintiff in that case, represented by his executor, had acquired a contractual right to import Iranian oil after the government of that country had nationalized its wells. He negotiated with Cities Service concerning the purchase of crude oil, but after indicating some initial interest, Cities apparently changed its mind. Plaintiff sued, alleging that Cities and seven other oil companies had conspired to boycott plaintiff's oil. Eventually, Cities filed a motion for summary judgment with supporting affidavits. The motion was granted and plaintiff appealed. The Supreme Court summarized the argument as follows:

"Petitioner argues that the inference that Cities was a participant in the alleged conspiracy to boycott him fol-

lows from the foregoing facts. Even viewed without reference to other facts of record, it is apparent that petitioner's main argument is that Cities' failure to follow through on its original substantial interest in dealing with him is substantial evidence of participation in the boycott allegedly organized by the other defendants. And undoubtedly, given no contrary evidence, a jury question might well be presented as to Cities' motives in not dealing with Waldron. Cf. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, [82 S.Ct. 486, 7 L.Ed.2d 458] (1962), notwithstanding that such a failure to deal conceivably might also have resulted from a whole variety of non-conspiratorial motives involving the exercise of business judgment as to the attractiveness of the opportunity offered by petitioner. However, as we next show, the record in this case contains an overwhelming amount of such contrary evidence of Cities' motives, much of it supplied by petitioner himself." 391 U.S. at 277, 88 S.Ct. at 1587.

The Court then went on to discuss the application of Rule 56(e), to the case:

"Essentially all that the lower courts held in this case was that Rule 56(e) placed upon Waldron the burden of producing evidence of the conspiracy he alleged only after respondent Cities Service conclusively showed that the facts upon which he relied to support his allegation were not susceptible of the interpretation which he sought to give them. That holding was correct. To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigant's rights to a trial

on their claims, *we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint."* 391 U.S. at 289, 290, 88 S.Ct. at 1593. (Emphasis added).

The Sixth Circuit recently applied the *Cities Service* holding in an antitrust case involving an alleged conspiracy in Daily Press, Inc. v. United Press International, 412 F.2d 126 (6th Cir. 1969). The District Court found that there was no genuine issue of material fact, in addition to finding that the charges in the complaint were wholly unfounded and unsupported by the evidence, granted defendant's motion for summary judgment. In affirming, the Court of Appeals stated that the plaintiff could no longer rely on conclusory allegations in the complaint, but, rather, must indicate a genuine issue for trial on specific facts.

In other words, the plaintiff must present facts to support its allegations. This, plaintiff has not done and apparently cannot do. The naked assertions and broad generalities put forth by this plaintiff are insufficient to overcome defendant's motion for summary judgment. Bushie v. Stenocord Corp., 460 F.2d 116 (9th Cir. 1972).

Plaintiff in its complaint also alleges that Ford has conspired to monopolize and attempted to monopolize the manufacture, distribution and sale of automotive and related non-automotive products, in violation of § 2 of the Sherman Act (15 U.S.C.A. § 2). However, on oral argument, plaintiff stated that its reliance on this Section was misplaced. The Court agrees.

 The product market, as set out in the complaint, is obviously overly broad. It is well settled that an issue under § 2 must be examined in the context of a relevant market. In United States v. E. I. duPont de Nemours and Co. (Cellophane), 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956), the Supreme Court established the following criteria:

"In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade of commerce', monopolization of which may be illegal."

The court further stated at page 404, 76 S.Ct. at 1012:

"The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered."

It is also well established by Supreme Court decisions that there may be well defined submarkets for antitrust purposes.

"The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962).

In light of these cases, it is clear that the product market is not "automotive and related non-automotive supplies", but, rather, is unsupported vinyl film. To define the market otherwise would, in effect, allow plaintiff to sue for injury to the public-at-large, since plaintiff was only a distributor of unsupported vinyl film. To allow such a recovery would be contrary to the clear language in § 4 of the Clayton Act. Hawaii v. Standard Oil, 405 U.S. 251, 92 S.Ct. 885,

31 L.Ed.2d 184 (1972); Revere Camera Co. v. Eastman Kodak Co., 81 F.Supp. 325 (N.D.Ill.1948).

■ In order to prove its case under § 2, Zenith must show that Ford had a specific intent to monopolize and that there was a dangerous probability of success. Intent alone is not sufficient to prove an attempt. Bushie v. Stenocord Corp., *supra*. As clearly shown by affidavits attached in support of this motion, Ford's market share of all vinyl film sales (supported and unsupported) was less than one per cent, and its share of the unsupported vinyl film market was less than one-tenth of one per cent at all times during the past ten years (Frailey, para. 6). These figures represent insignificant shares of the relevant product market.

The hallmark of monopoly power is that "power exists to raise prices or to exclude competition when it is desired to do so". American Tobacco Co. v. United States, 328 U.S. 781, 811, 66 S.Ct. 1125, 1140, 90 L.Ed. 1575 (1946); Kansas City Star Company v. United States, 240 F.2d 643, 663 (8th Cir. 1957). Thus, the potential foreclosure of 20 per cent of the market for milk products was recently held *not* to show a dangerous probability of success in a § 2 action.

> "An unlawful attempt to monopolize presupposes a 'dangerous probability' of monopolization if the attempt is successful. (Citations omitted). Twenty per cent alone of a market would be insufficient to achieve a monopoly. While size is an earmark of monopoly power, a substantial part of the market must be controlled by the monopolist to enable the raising and lowering of prices and the undue restriction on competition." Hiland Dairy, Inc. v. Kroger Company, 402 F.2d 968, 974 (8th Cir. 1968).

Clearly, then, there can be no dangerous probability of Ford successfully monopolizing the market involved in this case when it has never had more than one-tenth of one per cent of the unsupported vinyl market and never more than one per cent of the total vinyl market (Scholz, para. 7, 8).

■ A complaint which fails to show an intent to monopolize, coupled with a dangerous probability of success, may be dismissed for failure to state a claim for which relief can be granted. McElhenney Co. v. Western Auto Supply Co., 269 F.2d 332 (4th Cir. 1959). It is clear, therefore, that such a complaint cannot survive a motion for summary judgment unless some evidence of both elements is produced in opposition.

In view of all of the above considerations, it is ordered that Defendant Ford's Motion for Summary Judgment be, and hereby is, granted.