AARON E. LEVINE AND COMPANY,
INC., Plaintiff,

v.

CALKRAFT PAPER COMPANY and
Unijax, Inc., Defendants.

Civ. A. No. 74–71300.

United States District Court,
E. D. Michigan, S. D.

April 9, 1976.

Marshall Wallace, Southfield, Mich., Thomas P. Meehan, Kuder, Sherman, Fox & Meehan, Washington, D. C., for plaintiff.

A. Stewart Kerr, Kerr, Wattles & Russell, Detroit, Mich., Thomas Moseley, Cadwalader, Wickersham & Taft, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS MOTION FOR SUMMARY JUDGMENT

KAESS, District Judge.

This civil action has been brought pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15) to recover treble damages for alleged violations of Section 1 of the Sherman Act (15 U.S.C. § 1). Count II alleges breach of contract in wrongfully refusing to fill shipping orders. Count III charges that

the defendant Calkraft's termination of plaintiff's distributorship constitutes a breach of its common law duty to maintain a valuable franchise. Defendants Calkraft, Inc. and Unijax, Inc. have brought this motion for summary judgment. Rule 56, Federal Rules of Civil Procedure.

Plaintiff Aaron E. Levine and Company, Inc. is a Michigan corporation with its principal place of business in Detroit, Michigan. During the time in question Levine was a distributor of kraft products. Kraft is a coarse paper made from wood pulp and used chiefly for grocery bags, merchandise bags and kraft wrap. Aaron Levine and Company, Inc. acted both as a broker, soliciting orders on behalf of principals and also purchased items on its own behalf for later resale. Levine also employed salesmen who solicited customers on its behalf in Michigan, northwest Ohio, and northern Indiana.

Defendant Calkraft Paper Company, a Florida corporation, operated a paper mill and bag plant for the manufacture of kraft products during the time in question. Both the mill and bag plant are located in Louisiana, its principal place of business. Calkraft produced kraft products until July, 1974, when its assets were sold to Boise Southern Corporation. During the time in question, Calkraft was a wholly owned subsidiary of Unijax, Inc. Walter L. Moore acted as President of both corporations. Defendant Unijax, Inc., also a Florida corporation, is a distributor of kraft, paper, and related products. Unijax purchased kraft products from manufacturers and marketed them through branch outlets and affiliated corporations. During the 1970's Unijax and its affiliates maintained approximately thirty branch outlets, chiefly in the southeastern United States.

In December, 1968, Levine was solicited by Calkraft sales representatives to act as a distributor of Calkraft's products in Michigan. At that time, Levine was a distributor of kraft products of Gilman Paper Company. There was never any written agreement between Levine and Calkraft. In accordance with the parties' oral agreement, orders were telephoned or teletyped to the mill, followed by a written order transmitted by mail. Generally, Calkraft returned a written acknowledgement in response, setting forth the shipping date and method of shipment. The plaintiff Levine, expanded his market to the area around Toledo, Ohio and South Bend, Indiana. During the latter part of 1972, the demand for kraft products began to exceed supplies, and kraft prices began to rise rapidly. During February and March of 1973, Calkraft informed Levine that it wished to terminate him as a distributor. Plaintiff alleges that this termination was the result of pressure by Unijax, its parent corporation, to sell a greater volume of products to it at a time of nationwide kraft scarcity. Defendants Calkraft and Unijax insist that they merely withdrew from the Michigan market which became unprofitable due to rising transportation costs from its mill in Louisiana coupled with mandatory price controls which were in effect at the time. On December 5, 1973, Calkraft formally advised Levine that it was terminating their relationship. Plaintiff filed this action on March 19, 1974.

■ In considering a motion for summary judgment, the record will be viewed in the light most favorable to the party opposing the motion. *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *McHenry v. Ford Motor Co.,* 269 F.2d 18 (6th Cir. 1959). However, the court may piece the pleadings and determine from the depositions, admissions and affidavits, whether material issues of fact actually exist. *Smoot v. Chicago, R. I. & P. R. Co.,* 378 F.2d 879 (10 Cir. 1967).

■ Generally, summary judgment should be used sparingly in antitrust litigation. *Poller v. Columbia Broadcasting System, Inc.,* supra, *Alles Corp. v. Senco Products, Inc.,* 329 F.2d 567 (6th Cir. 1964). This does not mean, however, that Rule 56 of the Federal Rules of Civil Procedure is inapplicable in antitrust cases; and when appropriate, summary judgment may be granted. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

In *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Supreme Court affirmed that allegations of restraint of trade must be supported by significant probative evidence in order to overcome a motion for summary judgment. In that case, plaintiff had acquired a contractual right to import Iranian oil. He negotiated with Cities Service concerning the purchase of crude oil. Cities abandoned the deal. Plaintiff then sued Cities and seven other companies, alleging a conspiracy to boycott plaintiff's oil. Cities' motion for summary judgment was granted. On appeal the Supreme Court stated:

> "To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigant's rights to a trial on their claims, *we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a fulldress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.*" 391 U.S. at 289, 290, 88 S.Ct. at 1593. (Emphasis added).

Accord, *Daily Press v. United Press International,* 412 F.2d 126 (6th Cir. 1969); *Zenith Vinyl Fabrics Corp. v. Ford Motor Company,* 357 F.Supp. 133 (E.D.Mich., S.D. 1973), aff'd 1974–2 Trade Cases Para. 75,290 (6th Cir. 1974), cert. denied, 419 U.S. 967, 95 S.Ct. 231, 42 L.Ed.2d 183 (1974).

In the present case, Count I of the plaintiff's complaint charges that Unijax and Calkraft conspired to refuse to deal with plaintiff Levine, in violation of § 1. It is well settled that a refusal to deal, without more does not constitute a violation of the Sherman Act. *United States v. Colgate and Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Zenith Vinyl Fabrics Corp. v. Ford Motor Company,* supra; *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir. 1963).

A refusal to deal violates Section 1 only if it is done pursuant to a contract, combination or conspiracy and the refusal results in an unreasonable restraint of trade. 15 U.S.C. § 1; *United States v. Parke Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Thus the Sherman Act requires the concerted actions of two or more persons. As the Supreme Court stated:

> "An act harmless when done by one may become a public wrong when done by many acting in concert, for it then takes on the form of a conspiracy . . . ." *Eastern States Retail Lumber Dealers' Assn. v. U. S.,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914).

There is generally no difficulty in determining whether the requisite plurality of persons is present in a given situation. However, in Section 1 cases involving closely affiliated corporations, the courts have had difficulty ascertaining who are separate parties capable of contracting or conspiring with each other. Such agreements are often termed "bathtub" conspiracies. E. Rockefeller, *Antitrust Questions and Answers,* p. 27.

It is generally accepted that a corporation and its unincorporated branches or divisions are not separate entities, capable of conspiring to commit a Section 1 violation. *Poller v. CBS,* 109 U.S.App.D.C. 170, 284 F.2d 599 (1960); *Hawaiian Oke and Liquors, Ltd. v. Joseph E. Seagram and Sons, Inc.,* 416 F.2d 71 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). It is likewise generally accepted that a corporate office is not capable of conspiring with his corporation. *Nelson Radio & Supply Co. v. Motorola,* 200 F.2d 911 (5th Cir. 1952); *Marion County Co-Op Assn. v. Carnation Co.,* 114 F.Supp. 58 (W.C.Ark.1953).

It has also been widely held that, under normal circumstances, a parent and

its incorporated subsidiary cannot conspire in violation of Section 1 where they are not in actual competition in the market. See *Ark Dental Supply Co. v. Civitron Corp.,* 461 F.2d 1093, 1094 n. 1 (3d Cir. 1972); *United States v. Arkansas Fuel Oil Corp.,* 1960 Trade Case Para. 69,619 (N.D.Okl. 1960); *Alpha Distributing Co. v. Jack Daniel's Distillery,* 207 F.Supp. 136 (N.D.Cal., S.D.1961), *aff'd,* 304 F.2d 451 (9th Cir. 1962); *Call Carl, Inc. v. BP Oil Corporation,* 403 F.Supp. 568 (D.Md.1975). For example, *Call Carl, Inc. v. BP Oil Corporation, supra,* involved an action brought by independent service station operators against a gasoline marketer and its subsidiary, following cancellation of their franchises. The court concluded:

"Common sense dictates the conclusion that where conspirators are not competitors in the market in which the prices are allegedly being fixed, and there is horizontal competition in that market, then no harm can be done, and therefore no restraint of trade can be accomplished by an agreement to refuse to deal or to fix prices." 403 F.Supp. 568, 572–3 (1975).

*Ark Dental Supply Company v. Cavitron Corporation, supra,* also involved a distributor alleging antitrust violation by a conspiracy between Cavitron and its subsidiary manufacturer. The court in this case held that termination of a distributorship contract in order to sell exclusively to its parent corporation was not a violation of Sherman § 1.

In certain cases involving a flagrant violation of the Sherman Act, a contrary result was obtained. In *United States v. Yellow Cab Company,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), a company was formed which acquired controlling interests in six major taxicab companies and which dominated the ownership of taxi licenses in Chicago, New York, Pittsburgh and Minneapolis. The companies then agreed to control the operation and purchase of cabs in these cities. The affiliated corporations argued that they operated within an integrated enterprise which would prevent any agreements between them from constituting a conspiracy. The Court rejected this argument, stating:

"(A)n unreasonable restraint on interstate commerce . . . may result as readily from a conspiracy among those who are affiliated or integrated under common ownership as from a conspiracy among those who are otherwise independent . . . The corporate interrelationships of the conspirators, in other words, are not determinative of the applicability of the Sherman Act."

332 U.S. at 227, 67 S.Ct. at 1565 and *Timken Roller Bearing v. United States Court* in 1950, involved large affiliated corporations in the marketplace who were competitors and who agreed to fix the prices at which their product could be sold to distributors. *Kiefer-Stewart Company v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *Timken Roller Bearing Company v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) involved pervasive agreements tying between a parent company, its subsidiaries and a nationwide chain of dealers. This past year, the Supreme Court was again faced with alleged intracorporate conspiracy. Citizens and Southern National Bank of Georgia had established branches as "independent" banks in order to avoid Georgia's restrictive law on branch banking. These banks remained affiliated with C & S which controlled about 5% of the stock. The remainder of the stock was owned by parties friendly to C & S. While determining that the parent's relationship with the "5% banks" did not constitute a restraint of trade, the court stated:

"This Court has held that even *commonly owned firms must compete against each other,* if they hold themselves out as distinct entities. *United States v. Citizens and Southern National Bank,* 422 U.S. 86, 95 S.Ct. 2099, 45 L.Ed.2d 41." (Emphasis added)

█ This court is not persuaded that there is any rational basis to differentiate

between a parent and its wholly owned subsidiary merely upon the basis of whether or not the subsidiary is doing business in corporate form. Where, as here, an incorporated subsidiary is wholly owned and where the same individual is president of both corporations, it seems ludicrous to treat them as separate entities. The decision to do business in corporate form is often dictated by conditions quite distinct from market considerations, such as for tax or managerial convenience. The doctrine of intra-corporate conspiracy has been the subject of repeated criticism by respected commentators on antitrust law. As Professor Handler of Columbia University has stated:

> "It obviously exalts from over substance to say that if the presidents of two wholly owned subsidiaries agree on a common marketing strategy involving . . . selection of customers . . . and the like they have engaged in a criminal enterprise, whereas the same conduct by departmental heads in a single corporation is immune from attack. I am still unable to understand why the use of a corporate form in internal organization should result in total antitrust exposure."

"Twenty-Fifty Annual Antitrust Review," 73 Col.L.Rev. 415 (1973). *See also,* Mc Quade, "Conspiracy Multacorporate Enterprises and Section One of the Sherman Act." 41 U.Va.L.Rev. 183 (1955); Rahl, "Conspiracy and the Anti-Trust Laws," 44 Ill.L.Rev. 743 (1950); Willis and Pitofsky, Antitrust Consequences of Using Corporate Subsidiaries, 43 N.Y.L.Rev. 20 (1968). As another commentator reasoned:

> "The decisions applying Section 1 to 'bathtub conspiracies' suggest that the courts tend to rely on that doctrine when they would otherwise be prevented from taking action against what they regard as a flagrant violation of the spirit of the Sherman Act. The use of separate and independent sales organizations, the use of apparently rival brands, and a previous record of antitrust litigation predicated on the existence of separately incorporated enterprises—where these elements are present, the 'bathtub conspiracy' doctrine may yet have some life."

Rockefeller, *Antitrust Questions and Answers,* p. 31.

The present case does not present a situation where the parent and subsidiary are competitors in the same marketplace as in *Kiefer-Stewart* and *Timken.* Calkraft, Inc. operated a paper mill and kraft products manufacturing plant in Louisiana. (Levine brief at 3). At no time did it market its own products. Marketing has always been handled by brokers, including, among others, Unijax and Levine. (Levine Deposition at pp. 38–40) Therefore, Calkraft and Unijax never acted as competitors.

This case does not present a situation where a parent engages in business through subsidiaries and uses those subsidiaries to produce anti-competitive effects, as in *Yellow Cab.*

 Assuming, as we must, the facts in the light most favorable to the plaintiff, there are no material facts indicating that either Calkraft, the paper mill, nor its parent corporation Unijax ever engaged in competition with each other in the marketplace. While the plaintiff alleges that Unijax was an ever expanding distributor, Unijax was an actual competitor with him in the same marketplace. Levine alleges merely that Unijax became a stronger "potentially potential competitor." (Plaintiff's First Answers to Interrogatories, No. 76). It is uncontested that Unijax or its affiliates were engaged in the wholesale distribution of paper and related products primarily in the southeastern United States. Its nearest branches to the area of plaintiff's distributorship were in Illinois and Indiana. (Moore Affidavit at Para. 14). Plaintiff was a broker or distributor of products manufactured by Calkraft in Michigan, the Toledo area, and to a lesser extent, the area around South Bend, Indiana. (Levine Deposition at p. 5) Although Unijax did market some products in Indiana and Illinois, these products never reached 4% of its total sales. (Moore Affidavit at Paras. 91, 84) Therefore, it cannot be said that Unijax and plaintiff Levine were ever true competitors in the same

marketplace. Common sense dictates the conclusion that where the alleged conspirators are not competitors in the marketplace, either with each other or with the plaintiff, refusal to deal cannot result in the type of situation which the Sherman Act was meant to combat.

However, even assuming that such an intra-corporate conspiracy is found to exist, the plaintiff must still show that this conspiracy unreasonably restrained trade. A refusal to deal in and of itself is not a violation of the Sherman Act. *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283 (6th Cir. 1963). A manufacturer has a right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself. *United States v. Colgate & Co.*, *supra.* A refusal to deal becomes per se illegal under the Act only when it produces an unreasonable restraint of trade, such as price fixing, elimination of competition, or the creation of a monopoly. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 32, 80 S.Ct. 503, 4 L.Ed.2d 505; *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, supra*; *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162.

 The plaintiff alleges that the actions of defendants constitute a concerted refusal to deal, a per se violation of Sherman, § 1. However, a concerted refusal to deal requires a group boycott or concerted refusals by traders to deal with other traders. *Klor's v. Broadway-Hale Stores*, 359 U.S 207, 211, 79 S.Ct. 705, 3 L.Ed.2d 741 (1958). *Klor's,* for example, involved an agreement between Broadway-Hale and ten national manufacturers, and their distributors of small appliances not to sell to his competitor, thus extinguishing Klor's ability to compete in the marketplace. As the court noted at page 212, 79 S.Ct. at page 709:

> "This is not a case of a single trader refusing to deal with another, nor even of a manufacturer and dealer agreeing to an exclusive distributorship."

The present case does not involve a widespread conspiracy to cut off plaintiff's supply of kraft products. Rather, the refusal to deal here involves a single manufacturer.

In 1963, the Sixth Circuit was faced with a complaint similar to the one here. *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283 (1963). Ace Beer had an exclusive distributorship contract with Stroh Brewery. Stroh was the only company for which the plaintiff acted as distributor and the plaintiff's sole source and supply of merchandise for distribution and sale. Plaintiff fulfilled every requirement of its distributorship agreement and exerted its best efforts to sell and promote the sale of Stroh's products. To that end it incurred considerable sales and advertising expenses. Plaintiff alleged that Strohs conspired with another individual to destroy its business and to eliminate it as a beer distributor. This result was to be accomplished by the termination by Stroh of the plaintiff's franchise and by thereafter conducting its business through its co-conspirator. As the court held:

> "Unless it can be said that the refusal to deal with plaintiff had the result of suppressing competition and thus constituted 'restraint of trade' within the meaning of Section 1 of the Sherman Act, there is no violation of the Act. We do not think that the substitution by Stroh Brewery Company of one distributor for another had this result.

> It is well settled that the 'restraint of trade' referred to in Section 1 of the Act, means only unreasonable restraint of trade, in that, as the cases point out, every commercial contract has some restraining effect upon trade. *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 51, 31 S.Ct. 502, 55 L.Ed. 619; *United States v. American Tobacco Co.*, 221 U.S. 106, 179–180, 31 S.Ct. 632, 55 L.Ed. 663; *Chicago Board of Trade v. United States*, 246 U.S. 231, 238–239, 38 S.Ct. 242, 62 L.Ed. 683. The substitution of one distributor for another in a competitive market of the kind herein involved does not eliminate or materially diminish the existing competition of distributors of other beers, is not an unusual business procedure, and, in our opinion, is

not an unreasonable restraint of trade. *Hohensee v. Akron Beacon Journal Publishing Co.,* D.C., 171 F.Supp. 90, 174 F.Supp. 450, affirmed 277 F.2d 359, C.A. 6th, cert. denied, 364 U.S. 914, 81 S.Ct. 277, 5 L.Ed.2d 227; *Kinnear-Weed Corp. v. Humble Oil & Refining Co.,* 214 F.2d 891, C.A. 5th, cert. denied, 348 U.S. 912, 75 S.Ct. 292, 99 L.Ed. 715."

As this court stated in *Zenith Vinyl Fabrics Corporation v. Ford Motor Company,* 357 F.Supp. 133, 141 (E.D.Mich., S.D.1973), *aff'd,* 1974–2 Trade Cases Para. 75,290 (6th Cir. 1974), cert. denied, 419 U.S. 967, 95 S.Ct. 231, 42 L.Ed.2d 183 (1974):

> "The fact that a refusal to deal with a particular buyer without more, may have an adverse effect upon the buyer's business does not make the refusal to deal a violation of the Sherman Act. Damage alone does not constitute liability under the Act."

■ In the present case, plaintiff Levine was a broker or distributor of kraft products manufactured by Calkraft, a subsidiary of Unijax. Accepting as we must, the allegations of the plaintiff, Levine used his best efforts to sell the kraft products, hiring salesmen and aggressively pursuing new accounts. Plaintiff alleges, that Calkraft terminated his distributorship because it wished to sell greater percentages of its products to Unijax. Under the holdings enunciated in *Ace Beer Distributors, Inc. v. Kohn, Inc.* supra, and *Zenith Vinyl Fabrics Corporation v. Ford Motor Company,* supra, the reason for the refusal to deal is immaterial, provided it did not unreasonably restrain trade. Although plaintiff does allege that this action effectively removed him from access to the kraft product market, he was able to get a new supplier within 6 months. (Levine Deposition at pgs. 86, 87) Since plaintiff Levine also specifies that Calkraft manufactures no more than 6% of the kraft paper market, (Levine Memorandum at pgs. 5, 12) common sense demands the conclusion that other suppliers were available. Neither the withdrawal of a single manufacturer from an area, nor the substitution of one distributor for another limits or restrains the total volume of products in the marketplace. Rather, the supply of such products is merely diverted to other areas.

■ Plaintiff strongly argues the significance of the shortage of kraft products in the marketplace at the time in question. This shortage made it much more difficult for Levine to acquire a new source of supply. However, he has not disputed the fact that this kraft shortage was caused by a rise in the cost of manufacture and sharply advancing shipping charges, coupled with the imposition of government price controls during the time in question.

Although there are no Supreme Court cases on point other circuits have been faced with similar cases involving alleged antitrust violation during national shortage caused by government regulation. In *Independent Iron Works, Inc. v. United States Steel Corp.,* 177 F.Supp. 743 (N.D.Cal.1959), *aff'd* 322 F.2d 656 (9th Cir. 1963), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963), the Ninth Circuit held that steel manufacturers had not violated the Sherman Act during the time of the shortage by ratably allocating supplies to their customers, in addition to their own plants. In *Mullis v. Arco,* 502 F.2d 290 (7th Cir. 1974), the Seventh Circuit held that the cancellation of plaintiff's distributorship during the energy crisis when it was impossible to obtain a new source of supply, was not a violation of the Sherman Act. Although this suit was brought under Section 2 of the Sherman Act, the holding of the court is applicable here:

> "We therefore conclude that, whether we just consider the evidence of shortage in the record, or whether we also take cognizance of the distortions that may be produced by emergency measures, the injury of which plaintiff complains is not remediable under the Sherman Act."

It is only reasonable to assume that the restraint in trade must be caused by the acts of the defendant. This court concludes that the presence of a national shortage has no effect upon the liability of a supplier for his actions. The sole consideration of this

court must remain the determination of whether "the conspiracy . . . (was) in restraint of trade", § 1 Sherman Act, 15 U.S.C. § 1.

In the light of the factors discussed above, this court concludes that there was no restraint of trade caused by the acts of the defendants. Therefore the defendants motion for summary judgment as to Count I of the Complaint is hereby granted.

■ Count II alleges that the defendant Calkraft breached its contractual relations with plaintiff by refusing to fill orders without warning or justification or reasonable notice. Both parties agree that since jurisdiction is founded upon diversity and pendent jurisdiction, the choice of law which governs plaintiff's contract claim is that of the forum state. *Klaxon Co. v. Stentor*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Since the complaint involves a transaction in goods, the sales article of Uniform Commercial Code as adopted in Michigan is applicable. M.C.L.A. § 440.-2101 et seq.; M.S.A. § 19.2101 et seq. (hereinafter referred to as U.C.C. 2–101 et seq.)

Defendant asserts that the plaintiffs contract claim is barred by the Statute of Frauds, in that the agreement by its terms was not to be performed within one year (M.C.L.A. § 566.132; M.S.A. § 26.922) and was for the sale of goods for more than 500 (M.C.L.A. § 139.180; M.S.A. § 19.220). Defendant contends that a general oral contract existed between Calkraft and Levine whereby the parties agreed to enter into a brokerage or distributorship arrangement. Defendant emphatically denies the existence of such an arrangement. However, viewing the facts as we must, in the light most favorable to the plaintiff, there is sufficient evidence before the court to indicate the existence of such an arrangement. For example, a letter signed by the vice-president of Calkraft sets the terms under which future business between Calkraft and Levine is to be conducted. This letter refers to both past and future business between them, and evidences an ongoing working relationship.

Plaintiff claims both that Calkraft breached this distributorship relationship with him and also breached individual contracts which had been formed during the latter part of 1973. This court will discuss the alleged breach of the distributorship contract under Count III.

■ The material facts here are not in dispute. During the summer and fall of 1973, plaintiff continued to send orders to Calkraft. (Levine Affidavit, Exhibit 9) As a general rule orders are considered as offers to purchase. Some of these orders were not acknowledged. These orders stated that they were subject to confirmation and "acceptance" by Calkraft. (Defendants Exhibit, Sample Order Number 8013K) U.C.C. 2–206(1)(b) states:

"An offer to buy goods for prompt or current shipment shall be construed as inviting acceptance whether by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods."

As to the unacknowledged orders, no such confirmation or promise to ship was forthcoming from Calkraft. No shipment took place. Therefore, as to the orders which were not acknowledged by Calkraft, there was no acceptance of the offer to purchase and therefore no contract. Where there is no contract, there can be no action for breach of contract.

However twenty-eight orders were acknowledged by Calkraft. (Levine Affidavit, Exhibit 9) Plaintiff asserts that a valid and enforceable contract existed as to these acknowledge orders. The defendant asserts that as to twenty-four of those orders, plaintiff Levine received an acknowledgement form which stated on its face that it was subject to the terms and conditions on the reverse. On the reverse side were 12 paragraphs, the first of which stated:

"Any acceptance contained herein is expressly made conditional on Buyer's assent to the additional or different terms contained herein and acceptance by Buyer of delivery of any part of the merchandise covered hereunder shall be deemed to constitute such assent."

Under common law, an acceptance or confirmation which contained terms additional to or different from those of the offer constituted a rejection of the offer and thus became a counter offer. The Uniform Commercial Code recognized that in commercial transactions, the terms of the offer and those of the acceptance will seldom be identical. Rather, under the current "battle of the forms," each party typically has a printed form drafted by his attorney and containing as many terms as could be envisioned to favor that party in his sales transactions. Whereas under common law the disparity between the fine-print terms in the parties forms would have prevented the consummation of the contract when these forms are exchanged, Section 2–207 recognizes that in many, but not all cases the parties do not impart such significance to the terms on the printed forms. *Dorton v. Collins & Aikman Corporation*, 453 F.2d 1161, 1166 (6th Cir. 1972). *See* 1 W. Hawkland, A Transactional Guide to the Uniform Commercial Code, § 1.090 at 14; B. Stone, UCC in a Nutshell, 18–24 (1975).

Thus, Section 2–207(1) provides that:

"(a) definite and season expression of acceptance or a written confirmation . . . operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional terms."

In *Dorton v. Collins & Aikman Corporation, supra*, the Sixth Circuit held:

"In order to fall within this proviso, it is not enough that an acceptance is expressly conditional on additional or different terms; rather, an acceptance must be expressly conditional on the offeror's assent to those terms. Viewing the Subsection (1) proviso within the context of the rest of that Subsection and within the policies of Section 2–207 itself, we believe that it was intended to apply only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror's assent to the additional or different terms therein. See 1 W. Hawkland, supra, § 1.090303, at 21."

If the defendants assertions as to the acknowledgement forms is proven they would seem to come squarely within the *Dorton* holding. The form clearly and unequivocally demanded assent to the additional or different terms, or acceptance of delivery as manifestation of assent.

However, other orders were acknowledged by Calkraft by means of a different form. This second form (Defendants Exhibit, Order Form) also contained additional and different terms from the orders of the plaintiff. The UCC 2–207(2) states that additional terms are to be construed as proposals for addition to the contract. Between merchants, such terms are to become part of the contract unless they materially alter it. It is immaterial to the outcome of this decision whether the additional terms were intended by the parties to become part of the contract or to constitute counteroffers. Since the form specifically states: . . . *this acceptance* shall constitute the entire agreement between the parties unless otherwise confirmed (Emphasis added) it obviously acted as a definite and seasonable acceptance of the offer.

Viewing, as we must, the facts in the light most favorable to the plaintiff, it appears that an agreement existed between Levine and Calkraft, whereby it would ship orders to Calkraft and they would accept the orders by means of acknowledgement forms. As to at least some of the orders there is clear evidence that the acknowledgement form did in fact act as an acceptance of the offer to purchase. Therefore, an action lies as to breach of contract, and the defendants' motion for summary judgment as to Count II is hereby denied.

Count III charges that defendants breached their common law duty to plaintiff to maintain its valuable franchise and not to terminate such franchise without good cause or justification. It is true that courts often recognize the investment of time and money that a franchisee is re-

quired to make, and therefore often require that the arrangement not be arbitrarily terminated. However, the agreement with Calkraft does not have the earmarks of a franchise, namely the license from the owner of a trademark or trade name permitting another to sell his product or service under that name. See G. Glickman, *Franchising* § 2.01. Plaintiff has always done business under his own name. The relationship more closely resembles a distributorship. A distributor is a wholesaler, jobber or other merchant middleman authorized by a manufacturer or supplier to sell chiefly to retailers and commercial users. *Rubinger v. International Tel. and Tel. Corp.*, 310 F.2d 552 (2d Cir. 1962), *cert. denied* 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54; 19 A.L.R.3d § 1(a), 209, plaintiff acted as a middleman between Calkraft and his customers. Plaintiff Levine also describes himself as a distributor or broker, soliciting orders on behalf of principals and also taking title to products for resale. (Plaintiff's First Answers to Interrogatories 6 and 7).

■ Plaintiff cites no cases in support of a "common law duty" not to terminate a distributorship contract. There are no Michigan cases directly on point. Although varying results have been reached by the courts of other states where the distributorship contract contained no express provision regarding its duration, the general rule appears to be that they are terminable at will by either party or at least upon the giving of reasonable notice. *Schnerb v. Caterpillar Tractor Co.*, 43 F.2d 920 (2d Cir. 1930), *cert. denied* 282 U.S. 898, 51 S.Ct. 182, 75 L.Ed. 791; *Willcox & G. Sewing Machine Co. v. Ewing*, 141 U.S. 627, 12 S.Ct. 94, 35 L.Ed. 882 (1891); *Florida-Georgia Chemical Co. v. National Laboratories, Inc.*, Fla.App., 153 So.2d 752 (1963); *Superior Concrete Accessories v. Kemper*, Mo., 284 S.W.2d 482 (1955). The Uniform Commercial Code is in accord with these decisions. Section 2–309(2) states:

"Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time, but unless otherwise agreed may be terminated at any time by either party."

Plaintiff relies upon *Reeck v. Caloy*, 329 Mich. 453, 45 N.W.2d 349 (1951). In that case plaintiff was an established distributor for Dura Tile, selling to Sears-Roebuck among others. Caloy tile, a new manufacturer, offered plaintiff exclusive distributorship of its product for as long as plaintiff wanted the distributorship. Plaintiff accepted the offer and reached an understanding with Sears-Roebuck to change to Caloy tile. Plaintiff obtained samples and started training Sears salesmen and demonstrators in selling the new tile. Subsequently, Caloy cut off plaintiff as broker with respect to the Sears account and sold directly to the store without paying him commissions. The court held that under the circumstances Caloy did not have an absolute right to terminate the distributorship. As the court stated:

"In consequence, termination at any time by defendant might not leave the parties in status quo ante."

Clearly the situation is different in the present case. Plaintiff has not alleged that Calkraft attempted to take over his accounts and sell directly to his leading customers. At most, plaintiff here alleges that Calkraft's refusal to sell to him directly resulted in the withdrawal of kraft products from his market area. (Levine Affidavit at pg. 25)

■ This court therefore concludes that the distributorship agreement was terminable at will by either party. The UCC requires that reasonable notification be received by the other party. U.C.C. 2–309(3).

■ The consideration to what constitutes sufficient or reasonable notice of termination depends upon the circumstances of the particular case. However, the cases seem to hinge closely upon the amount of time necessary to enable the distributor to look for a new source of supply. In *Goodman v. Motor Products Corporation*, 9 Ill. App.2d 57, 132 N.E.2d 356 (1956), the court held the four months notice of termination of his thirteen year foreign distributorship of freezers was sufficient. In *Smoky Mountains Beverage Co. v. Anheuser-*

*Busch, Inc.*, 182 F.Supp. 326 (D.C.Tenn. 1960) the court held that two week oral notice of termination of a thirteen year exclusive distributorship of beer was reasonable.

In the present case, the distributorship agreement was formally terminated on December 5th, 1973. (Levine Affidavit, Exhibit 10). As early as February, 1973, ten months earlier, Craig advised Levine that Unijax had exerted pressure on Calkraft to terminate dealers like himself. (Levine Deposition at p. 137). In March, 1973, Craig informed Levine that the pressure from Unijax had increased and that Levine was to be terminated. When Levine objected that he would not be able to get a new supplier because of the tight market, Craig gave him the names of competing mills that he could call in an attempt to get a new affiliation. (Levine Deposition at pgs. 131–3). During the summer and fall of 1973, orders were accepted and acknowledged by Calkraft. On November 29, 1973, Calkraft advised Levine that it was terminated, effective immediately. (Levine Affidavit, Para. 18). The formal notice of termination was sent on December 5.

Levine attempted to replace Calkraft as early as March, 1973. He contacted numerous kraft manufacturers offering to purchase their kraft products. In July 1973, Gilman Paper Company, Levine's former supplier, began to supply him with a small amount of kraft products. (Levine Affidavit, Para. 24). Subsequently Levine re-entered into a distributorship contract with Gilman. (Levine Affidavit, Para. 24). From the above stated facts, it appears that plaintiff had sufficient notice to enable him to find a new source of supply, even in the tight market conditions existing at the time of the termination. Therefore, assuming that reasonable notice is required to terminate a distributorship contract, this court holds that such notice was given in the present case.

This court concludes that the distributorship contract between Calkraft and Levine was terminable at will and that reasonable notice of that termination was given.

Therefore, defendants' motion for summary judgment as to Count III is hereby granted.

For the above stated reasons, IT IS HEREBY ORDERED that defendants' motion for summary judgment be granted as to Count I and Count III and be denied as to Count II.